[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 4, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-11012

_____

D. C. Docket No. 00-00210 CR-T-30

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PEDRO LUIS CHRISTOPHER TINOCO, et al.,

Defendants,

MANUEL HERNANDEZ,
TITO DANIEL ESTUPINAN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(September 4, 2002)**

Before BIRCH and MARCUS, Circuit Judges, and FULLAM*, District Judge.

BIRCH, Circuit Judge:

Defendants-Appellants Manuel Hernandez and Tito Daniel Estupinan appeal their convictions under the Maritime Drug Law Enforcement Act, 46 U.S.C. app. §§ 1901 et seq. (1994 & Supp. V 1999) ("MDLEA"). They were convicted of conspiracy to possess with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. app. § 1903(a), (g), and (j), and of possession with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. app. § 1903(a), (g) and 18 U.S.C. § 2 (2000). We AFFIRM their convictions.

## I. BACKGROUND

A.    Factual Background

1.    The United States Coast Guard's Interception of the Smuggling Vessel in International Waters

On 18 June 2000, the United States Coast Guard cutter Thetis, a 270-foot ship with approximately 90 to 95 crew members, was on a counter-narcotics patrol in the Eastern Pacific Ocean. During the patrol, the Thetis encountered a fiberglass

---

*Honorable John P. Fullam, U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

vessel approximately 475 nautical miles west of the Columbian/Ecuadorian border in international waters. The vessel was approximately 40 feet in length, equipped with three outboard motors, and low in profile to the water. Thetis crew members later testified that Coast Guard officials refer to such vessels as "go-fast" boats because they can travel at high rates of speed, which makes them a favored vehicle for drug and alien smuggling operations. When the crew first observed the vessel, it was approximately 300 miles from the nearest point of land. Randy Bradley, a law enforcement officer aboard the Thetis, later testified that this type of vessel, when used for recreational purposes, usually would stay within 20 nautical miles of the shore due to its limited fuel capacity. Using binoculars, Thetis crew members did not see any markings of identification or a flag on the vessel. The crew attempted to hail the vessel by way of radio communications in English and Spanish but received no response.

As the Thetis proceeded towards the vessel, the Thetis crew launched a rigid-hull inflatable boat ("RHI") that contained a four-person boarding team that was ordered to intercept and board the vessel. Once the RHI was in the water, the unresponsive vessel changed its previous course and began zigzagging to the left and to the right. While the RHI boarding team was attempting the interception, lookout officers aboard the Thetis observed four individuals on the zigzagging

vessel. The individuals later were identified as Pedro Luis Christopher Tinoco, Neil Pomare Hoard, Manuel Hernandez, and Tito Daniel Estupinan, the four criminal defendants in this case.[1] The Thetis lookout officers saw one defendant driving the vessel, one defendant walking back and forth on the vessel, and two defendants throwing overboard what were later identified as bales of cocaine and 55-gallon fuel drums. Due to the distance, the Thetis lookout officers were unable to see the faces of the defendants and thus were unable to identify which defendant was performing which activity as the RHI chased the zigzagging vessel. To locate the items thrown overboard by two of the defendants, the Thetis crew threw into the ocean two smoke floats, pyrotechnic devices that emit smoke for two to three hours when immersed in sea water.

As they pursued the zigzagging vessel, the RHI boarding team, like the Thetis lookout officers, observed the defendants aboard the vessel dumping items into the ocean. They saw bales, fuel drums, wooden objects, and the vessel's hatch being thrown overboard. As was true regarding the Thetis lookout officers, however, the RHI boarding team was unable to identify which of the four

---

[1]Tinoco and Hoard were convicted on both MDLEA counts, as were Hernandez and Estupinan. Tinoco, initially an appellant, has dismissed his appeal. Nor is Hoard a party to this appeal. When speaking of Tinoco, Hoard, Hernandez, and Estupinan collectively, we will refer to them as the "defendants." When speaking only of Hernandez and Estupinan, we will refer to them as the "appellants."

defendants were involved in dumping the items. Finally, after a 20 to 30 minute chase, the RHI was able to intercept the vessel. RHI Boarding Officers Tim Burke and Shelby Harrington then boarded the vessel and handcuffed the defendants.

Officer Burke testified at trial that, once on board, he asked the vessel's driver, later identified as Defendant Tinoco, about the vessel's country of origin. Tinoco answered that the vessel was from Colombia. In a statement introduced by the defendants at trial,[2] Officer Harrington stated that she spoke with the defendant later identified as Hoard, who told her that the vessel's crew was from San Andreas, Colombia, and that the vessel was from Buena Venture, Colombia. Hoard also told her that the vessel was en route to the Galapagos Islands. When asked which of the four defendants was the vessel's master, Hoard pointed to Tinoco. After Officers Burke and Harrington spoke with Tinoco and Hoard, the RHI boarding team conducted a search of the vessel. The passports of the four defendants were obtained. Despite a thorough search, however, the RHI boarding team was unable to find any identifying marks or registration documents that would confirm the claims made by Tinoco and Hoard that the vessel was Colombian in origin. The only other items found on board were spare engine parts,

---

[2]Officer Harrington was medically unable to testify at the trial. In lieu of trial testimony, her written statement was introduced by stipulation of the parties. See Shelby Statement, R2-121 Exh. 4.

navigational and communication equipment, approximately 30 fuel drums, food and beverages, and clothing.

Following the search of the vessel, the defendants were transferred to the Thetis cutter. Several members of the Thetis crew then proceeded to search the waters where the smoke floats had been thrown, using the vessel that had been seized to conduct the recovery operation.[3] Approximately 97.5 wrapped bales were retrieved from the water. The bales subsequently were transferred to a Drug Enforcement Administration ("DEA") warehouse in Miami, Florida. Scott Goodlin, a DEA forensic chemist, then sampled the bales and tested them for the presence of a controlled substance, finding that they contained cocaine. At trial, Goodlin estimated that, based on his sampling technique, the net weight of cocaine contained in the seized bales was 1,807 kilograms. The market value in the United States of this amount of cocaine, at the time the trial occurred, would have ranged from $12,000 to $29,000 per kilogram, according to the trial testimony of Adalberto Rivera, a drug agent at the Federal Bureau of Investigation ("FBI").

    2.    The United States Coast Guard's Communications with the

---

[3]Following the recovery of the bales of cocaine, the Coast Guard destroyed the vessel. They did so after determining that it would be impractical to tow the vessel, and after determining that the unmanned vessel, which lacked signal lights, would pose a danger to other ships.

Colombian Navy

At the time the aforementioned events were occurring in the Eastern Pacific Ocean, a series of diplomatic communications took place between the Coast Guard and the Colombian Navy. After RHI Boarding Officers Burke and Harrington spoke with Tinoco and Hoard about the nationality of the vessel and its crew, Officer Harrington relayed a radio communication to Christopher Barrows, an operations officer onboard the Thetis. She informed him about the verbal claims made by the defendants that the vessel was from Colombia and that the crew was of Colombian nationality. The Coast Guard was to use this information to brief the Colombian Navy about the interception.

After receiving the information from Officer Harrington, Officer Barrows communicated with, and sent a series of situation reports to, a Lieutenant Jelin from the Coast Guard District 11, who subsequently provided the information to the Coast Guard headquarters and the United States Department of State in Washington, D.C. Pursuant to the terms of the "Agreement between the Government of the United States of America and the Government of the Republic of Colombia to Suppress Illicit Traffic by Sea," the Coast Guard then contacted the Colombian Navy, briefed it about the situation, and requested that the Colombian Navy attempt to verify the verbal claims by the defendants that their vessel was

7

registered in Colombia. The purpose of these communications was to determine whether the vessel was a "vessel subject to the jurisdiction of the United States" as defined in the MDLEA, 46 U.S.C. app. § 1903(c), which would permit the United States to exercise jurisdiction over the case.

Shortly thereafter, the Colombian Navy responded that it needed the name and registration number of the vessel before it could confirm or refute the verbal claims that the vessel was of Colombian origin. The Coast Guard then informed the Colombian Navy that it was unable to provide any additional information, given the absence of any identifying marks on the vessel and of any registration documents found on board. The Coast Guard also told the Colombian Navy that "the four crewman aboard the vessel refused to provide any information pertaining to their personal identification or that of the vessel." Schultz Decl., R2-122 Exh. 20 at 3.[4] Based on the information provided by the Coast Guard, the Colombian Navy stated that it was unable to confirm or refute the verbal claims made by the

[4]Karl Schultz, the Coast Guard Liaison Officer to the Bureau for International Narcotics and Law Enforcement Affairs in the United States Department of State, filed a declaration that detailed the diplomatic communications between the Coast Guard and the Colombian Navy, thereby providing an explanation as to why the Colombian Navy was unable to confirm or deny the verbal claims by Tinoco and Hoard that their vessel was registered in Colombia. Under the MDLEA, 46 U.S.C. app. § 1903(c)(2), the Secretary of State or the Secretary's designee is authorized to certify whether a foreign government has denied a claim by a vessel's master that the vessel is registered in that country. The Secretary of State, through the Assistant Secretary of State for International Narcotics and Law Enforcement Affairs, designated Schultz to make such certifications.

defendants that their vessel was of Colombian registry. As a result, the Coast Guard "assimilated the vessel to stateless status." Id. In terms of the MDLEA, the vessel was treated as a a "vessel without nationality," as defined in § 1903(c)(2)(C), and thus as a "vessel subject to the jurisdiction of the United States" under 46 U.S.C. app. 1903(c)(1)(A).[5] Accordingly, the four defendants were transported to the Middle District of Florida, Tampa Division, to face federal prosecution for the alleged drug smuggling operation.

B.    Indictment, Conviction, and Sentence

On 19 July 2000, a federal grand jury returned a two-count superceding indictment[6] against Tinoco, Hernandez, Estupinan, and Hoard, charging that they committed two offenses under the MDLEA, to wit:  conspiracy to possess with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. app. § 1903(a), (g), and (j) (Count I), and possession with intent to distribute five

---

[5]Section 1903(c)(1)(A) states that a "vessel without nationality" is a "vessel subject to the jurisdiction of the United States." 46 U.S.C. app. § 1903(c)(1)(A). Section 1903(c)(2)(C), in turn, provides that the designation "vessel without nationality" applies to a vessel whose master "makes a claim of registry and the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. app. § 1903(c)(2)(C).

[6]The superceding indictment contained the same charges and language found in the original indictment. The only difference was that the phrase "without nationality" — which followed the words "subject to the jurisdiction of the United States" in Count I of the original indictment — was deleted from the superceding indictment. Compare R1-3 with R1-39.

9

kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. app. § 1903(a), (g) and 18 U.S.C. § 2 (Count II). The Defendants pled not guilty. In December of 2001, the four defendants were tried before a federal jury, and all four of them were convicted on both counts.

Following the convictions, the district court meted out sentences for the drug trafficking operation. The district court sentenced Hernandez to a term of 200 months of imprisonment and to 5 years of supervised release on each count, to run concurrently, and he was charged a $200 special assessment. The court sentenced Estupinan to a term of 252 months of imprisonment and to 5 years of supervised released on each count, to run concurrently, and he was charged a $200 special assessment.[7] After imposition of sentence, Hernandez and Estupinan commenced this appeal to challenge their convictions.

C.      Issues on Appeal

Appellants Hernandez and Estupinan raise numerous arguments as to why their convictions on both counts under the MDLEA should be overturned.[8] The

_____

[7]We do not discuss Tinoco and Hoard's sentences since neither defendant is involved in this appeal.

[8]Hernandez and Estupinan have adopted each other's arguments for purposes of this appeal.

10

appellants raise two arguments premised on the United States Constitution. First, they contend that the MDLEA, 46 U.S.C. app. § 1903, is facially unconstitutional because its penalty provision, § 1903(g) — a provision that incorporates the penalties framework set forth in 21 U.S.C. § 960 (2000) — violates the dictates of Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000). Second, they challenge on constitutional grounds the jurisdiction and venue provision of the MDLEA, 46 U.S.C. app. § 1903(f), which requires that the issue of whether a vessel is subject to the jurisdiction of the United States be decided by the trial judge as a preliminary issue of law, rather than be submitted to the jury for proof beyond a reasonable doubt. The appellants assert that the jurisdiction and venue provision violates the principles enunciated in United States v. Gaudin, 515 U.S. 506, 115 S. Ct. 2310 (1995).[9]

The appellants raise several arguments in addition to their constitutionally based ones. They maintain that, even if it was proper under 46 U.S.C. app. § 1903(f) for the district court to decide whether their vessel was subject to the jurisdiction of the United States, the court erred in concluding that the government met its evidentiary burden with respect to the jurisdictional issue in this case. The

---

[9]With respect to their second constitutionally based argument, the appellants apparently concede that the MDLEA jurisdiction and venue provision, if unconstitutional, is severable from the remainder of 46 U.S.C. app. § 1903.

appellants also contend that the district court erred in denying their motion in limine to suppress the cocaine seized by the Coast Guard.  Furthermore, they assert that the district court made several improper evidentiary rulings during the trial, the cumulative effect of which was reversible error, including:  admitting the testimony of Officer Bradley and Agent Rivera as lay opinion testimony, when their testimony should have been considered expert testimony, thereby subjecting the government to the pretrial disclosure requirements of Federal Rule of Criminal Procedure 16(a)(1)(E); allowing government witnesses to use the phrase "go-fast" when discussing the appearance of the defendants' vessel; and permitting testimony concerning the market value of the seized cocaine.  Besides these arguments, the appellants challenge their convictions on the grounds that the district court erred in not granting their respective motions for judgment of acquittal under Rule 29.  We will address each of these arguments in turn.

## II.  DISCUSSION

A.    The Facial Constitutionality of 46 U.S.C. app. § 1903 in Light of the _Apprendi_ Decision

1.    The Statutory Framework

In this subsection of our opinion, we analyze the effect of the Supreme Court's Apprendi decision on the MDLEA, 46 U.S.C. app. § 1903, which contains a penalty provision, § 1903(g), that incorporates the penalties framework found in

21 U.S.C. § 960.  In doing so, we begin with the language of § 1903.  See United States v. Prather, 205 F.3d 1265, 1269 (11th Cir.), cert. denied, 531 U.S. 879, 121 S. Ct. 188 (2000). ("In interpreting the meaning of a statute, it is axiomatic that a court must begin with the plain language of the statute.").  Section 1903(a) of the Title 46 appendix defines the substantive offenses for which a defendant can be convicted under the MDLEA.  The subsection provides:

> It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, or who is a citizen of the United States or a resident alien of the United States on board any vessel, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

46 U.S.C. app. § 1903(a).[10]

The penalty provision for violations of § 1903 is contained in subsection (g).  Section 1903(g), entitled "Penalties," states that "[a]ny person who commits an offense defined in this section shall be punished in accordance with the penalties set forth in section 1010 of the Comprehensive Drug Abuse Prevention and

---

[10]Section 1903(j) creates separate MDLEA offenses for attempt and conspiracy: "Any person who attempts or conspires to commit any offense defined in this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  46 U.S.C. app. § 1903(j).  Because the penalties for a violation of § 1903(a) are the same as those for a violation of § 1903(j), our analysis applies to defendants charged under either subsection (a) or (j).  Additionally, for convenience, we only reference § 1903(a) in our discussion in Part II.A.-C. of this opinion, even though the appellants also were convicted on a conspiracy count.

13

Control Act of 1970 (21 U.S.C. [§] 960)." 46 U.S.C. app. § 1903(g)(1).  It follows that § 1903(f) incorporates by reference the penalties framework of 21 U.S.C. § 960.

We address, then, the language of § 960.  Section § 960(b), entitled "Penalties," delineates a framework of penalties that vary depending on whether certain factors have been met in a particular drug case, such as the drug type and quantity involved.  Section § 960(b) states in several places that a defendant is to be sentenced according to the penalties framework contained therein when a "violation" of § 960(a)[11] has been proven.  See 21 U.S.C. § 960(b)(1), (b)(2), (b)(3), (b)(4).  The statutory language indicates that Congress intended for the factors listed in § 960(b) to serve as sentencing factors that come into play only

_____

[11]Section 960(a) states:

> (a) Unlawful acts
>   Any person who -
>       (1) contrary to section 952, 953, or 957 of this title, knowingly or intentionally imports or exports a controlled substance,
>       (2) contrary to section 955 of this title, knowingly or intentionally brings or possesses on board a vessel, aircraft, or vehicle a controlled substance, or
>       (3) contrary to section 959 of this title, manufactures, possesses with intent to distribute, or distributes a controlled substance,
> shall be punished as provided in subsection (b) of this section.

21 U.S.C. § 960(a).

14

upon a defendant's conviction for a substantive offense under § 960(a).  See

United States v. Coy, 19 F.3d 629, 636-37 (11th Cir. 1994) (per curiam).  Thus,

drug type and quantity are not elements of a substantive offense under 21 U.S.C. §

960(a), but instead are factors to be considered by the judge at sentencing under §

960(b).  See id. at 637 (stating that "the quantity of drugs involved . . . under . . . §

960 is not an element of the offense that need be pled or proven at trial, but an

issue for the court to determine at the sentencing phase"); cf. United States v.

Sanchez, 269 F.3d 1250, 1266 (11th Cir. 2001) (en banc), cert. denied, __ U.S. __,

122 S. Ct. 1327 (2002) ("[Under 21 U.S.C. § 841,] neither the nature nor the

quantity of [the] substance is an element of [the] offense that must be submitted to

a jury or proved beyond a reasonable doubt.  Instead, this Court [has] held that in

order to obtain a conviction, the government need show only that some controlled

substance was involved.").  By analogy, when we read 46 U.S.C. app. § 1903(a) in

conjunction with 21 U.S.C. § 960(b), it is clear from the statutory language that

Congress intended for § 1903(a) to state a complete substantive drug offense,

without reference to drug type or quantity, and that Congress intended for the

sentencing factors enunciated in § 960(b) to come into play only upon a

defendant's conviction for an offense under § 1903(a).

Turning to a more detailed analysis of the sentencing factors found in 21

15

U.S.C. § 960(b), we point out that § 960(b) is divided into four sub-subsections, based on the quantity and type of drug involved. We discuss only the first three sub-subsections because the fourth sub-subsection is not applicable to cocaine,[12] the controlled substance relevant to this case. The most severe penalties are found in § 960(b)(1), which provides for a statutory maximum of life imprisonment. Specifically, with reference to cocaine, § 960(b)(1) states that in cases that involve "5 kilograms or more of a mixture or substance containing a detectable amount of . . . cocaine, . . . the person committing such violation shall be sentenced to a term of imprisonment of not less than 10 years and not more than life." 21 U.S.C. § 960(b)(1)(B)(ii). Section 960(b)(2), in turn, states that in cases that involve "500 grams or more of a mixture or substance containing a detectable amount of . . . cocaine, . . . the person committing such violation shall be sentenced to a term of imprisonment of not less than 5 years and not more than 40 years." 21 U.S.C. § 960(b)(2)(B)(ii).

---

[12]Section 960(b)(4) states in part:
> In the case of a violation under subsection (a) of this section with respect to less than 50 kilograms of marihuana, except in the case of 100 or more marihuana plants regardless of weight, less than 10 kilograms of hashish, less than one kilogram of hashish oil, or any quantity of a controlled substance in schedule III, IV, or V, (except a violation involving flunitrazepam and except a violation involving gamma hydroxybutyric acid) the person committing such violation shall be imprisoned not more than five years . . . .

21 U.S.C. § 960(b)(4) (internal footnote omitted).

In contrast to the first two sub-subsections, § 960(b)(3) is a catchall provision that provides for a term of imprisonment without reference to drug type or quantity. Cf. United States v. Trout, 68 F.3d 1276, 1280 (11th Cir. 1995) (per curiam) (referring to the similarly worded 21 U.S.C. § 841(b)(1)(C) as a "catchall provision"). Section 960(b)(3) states that in cases that involve "a controlled substance in schedule I or II, . . . the person committing such violation shall, except as provided in paragraphs (1), (2), and (4), be sentenced to a term of imprisonment of not more than 20 years." 21 U.S.C. § 960(b)(3). Cocaine is a schedule II controlled substance. 21 U.S.C. § 812(a)(4) (Schedule II); 21 C.F.R. § 1308.12(b)(4). Thus, § 960(b)(3) provides a penalty for violations involving cocaine without regard to the drug quantity involved.

2.    The Appellants' Apprendi Argument

Having laid out the penalties framework set forth in 21 U.S.C. § 960(b), we turn to the appellants' argument concerning its constitutionality, and by extension, the constitutionality of the MDLEA, 46 U.S.C. app. § 1903. In the present case, the four defendants filed a motion to dismiss the indictment,[13] asserting that their

---

[13] During the course of proceedings, each defendant moved to adopt all the motions by his co-defendants. The district court granted all of those motions, so that, unless a defendant opted out, he was considered to have participated in arguments made by the other defendants. Thus, unless we state otherwise, we treat every argument raised by a particular defendant during the district court proceedings as if it were raised by all the defendants.

17

indictment was premised on an unconstitutional statute. Specifically, they argued that the MDLEA is facially unconstitutional, given that it incorporates the penalties framework of 21 U.S.C. § 960(b), a framework that they contend violates the constitutional principles enunciated in the Supreme Court's Apprendi decision. In Apprendi, the Supreme Court held that the Due Process Clause and the Sixth Amendment right to trial by jury require that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S. Ct. at 2362-63. "In federal prosecutions, such facts must also be charged in the indictment." United States v. Cotton, __ U.S. __, __, 122 S. Ct. 1781, 1783 (2002). Rejecting the defendants' motion to dismiss the indictment, the district court concluded that 21 U.S.C. § 960(b), and thus the MDLEA, did not violate these principles.

On appeal, Hernandez and Estupinan begin their Apprendi argument by focusing on our precedent, which, as we have discussed, has treated the factors listed in 21 U.S.C. § 960(b) as sentencing factors, not as elements of an offense. See Coy, 19 F.3d at 636-37. Based on our precedent interpreting § 960(b) as setting forth sentencing factors for the judge to determine, the appellants contend that § 960 is unconstitutional under Apprendi because § 960(b) permits increases

18

in the maximum penalty to which a defendant can be subjected without requiring that those factors be treated as elements of the substantive offense. That is, the appellants' argument is that <u>Apprendi</u> mandates that the factors listed in § 960(b), such as drug type and quantity, must be charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt. Because our precedent construes § 906(b) in a manner that rejects such an approach, the appellants contend that § 960 is facially unconstitutional by virtue of <u>Apprendi</u>. It follows, the appellants maintain, that the MDLEA, 46 U.S.C. app. § 1903, is facially unconstitutional, given that it incorporates by reference the penalties framework contained in 21 U.S.C. § 960.

> 3.    The Effect of Our <u>Sanchez</u> Decision on Our Interpretation of 21 U.S.C. § 960

We review <u>de novo</u> the legal question of whether a statute is constitutional. <u>United States v. Cespedes</u>, 151 F.3d 1329, 1331 (11th Cir. 1998). "We also review <u>de novo</u> the legal question of whether an indictment . . . was insufficient under <u>Apprendi</u>, and we will reverse only if the <u>Apprendi</u> error was harmful." <u>United States v. Anderson</u>, 289 F.3d 1321, 1325 (11th Cir. 2002). Our review leads us to the conclusion that the appellants' argument is untenable in light of our <u>Sanchez</u> decision, which involved a statutory framework analogous to the one in this case. In <u>Sanchez</u>, we addressed the constitutionality of 21 U.S.C. § 841 in light of

Apprendi.  The language and structure of 21 U.S.C. § 841 is substantially similar to that of 21 U.S.C. § 960.  See Coy, 19 F.3d at 636-37 (indicating that § 841 and § 960 are conceptually analogous and thus can be analyzed in the same manner).  For instance, 21 U.S.C. § 841(a) sets forth a complete substantive drug offense, without reference to drug type or quantity, violations of which are punished under the penalties provided in § 841(b), in the same manner that 21 U.S.C. § 960(a) — as well as 46 U.S.C. app. § 1903(a) — set forth complete substantive drug offenses, without reference to drug type or quantity, violations of which are punished under the penalties provided in 21 U.S.C. § 960(b).  See Sanchez, 269 F.3d at 1264-65 (discussing interplay between 21 U.S.C. § 841(a) and (b)).

Additionally, the penalties framework found in § 841(b) is very similar to the framework found in § 960(b); indeed, the two provisions contain virtually identical language.[14]  Section 841(b)(1)(A) and (b)(1)(B), like § 960(b)(1) and

---

[14]Compare 21 U.S.C. § 841(b)(1)(A)(ii)(II) (stating that in cases that involve "5 kilograms or more of a mixture or substance containing a detectable amount of . . . cocaine, . . . such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life"), and § 841(b)(1)(B)(ii)(II) (stating that in cases that involve "500 grams or more of a mixture or substance containing a detectable amount of . . . cocaine, . . . such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years), and § 841(b)(1)(C)(stating that "[i]n the case of a controlled substance in schedule I or II, . . . except as provided in subparagraphs (A), (B), and (D), such person shall be sentenced to a term of imprisonment of not more than 20 years"), with 21 U.S.C. § 960(b)(1)(B)(ii) (stating that in cases that involve "5 kilograms or more of a mixture or substance containing a detectable amount of . . . cocaine, . . . the person committing such violation shall be sentenced to a term of imprisonment of not less than 10 years and not more than life"), and § 960(b)(2)(B)(ii) (stating that in cases that involve "500 grams or more of a mixture or substance containing a detectable

20

(b)(2), set different terms of imprisonment, based on the specific quantity and drug type involved, with § 840(b)(1)(A) and § 960(b)(1) setting a maximum term of life imprisonment, and § 840(b)(1)(B) and § 960(b)(2) setting a maximum term of 40 years. See Sanchez, 269 F.3d at 1264-65 (discussing the penalties framework set forth in § 841(b)(1)(A) and (b)(1)(B)). Moreover, § 841(b)(1)(C), like § 960(b)(3), creates a catchall provision that sets a maximum term of 20 years imprisonment without reference to the drug type or quantity involved. See id. at 1265 (describing how § 821(b)(1)(C) serves as a catchall provision). Furthermore, as with § 960(b), our precedent consistently has construed § 841(b) as setting forth sentencing factors that are to be determined by the judge. See id. at 1266 n.28 (listing cases). It follows that, because of the close similarity between the statutes involved, the Apprendi concerns raised in Sanchez mirror the concerns raised in the present case. We next address, therefore, our interpretation of Apprendi in the Sanchez case.

In Sanchez, we interpreted the Apprendi decision narrowly, concluding that Apprendi did not blanketly overturn prior cases that construed 21 U.S.C. § 841(b) as setting forth sentencing factors for determination by the judge. Id. at 1268.

---

amount of . . . cocaine, . . . the person committing such violation shall be sentenced to a term of imprisonment of not less than 5 years and not more than 40 years"), and § 960(b)(3) (stating that in cases that involve "a controlled substance in schedule I or II, . . . the person committing such violation shall, except as provided in paragraphs (1), (2), and (4), be sentenced to a term of imprisonment of not more than 20 years").

21

Rather, we determined that Apprendi merely serves as "an external constitutional restraint under the Sixth Amendment and the Due Process Clause" that forbids the judge during sentencing from making findings that actually increase the defendant's sentence above the prescribed statutory maximum. Id. This means that Apprendi "does not apply to the vast majority of sentencing scenarios," where the sentence actually imposed "falls within the range prescribed by the statute for the crime of conviction." Id. This also means that, in the context of federal drug cases, drug type and quantity do not have to be charged in the indictment or submitted to the jury for proof beyond a reasonable doubt, except when the finding of drug type or quantity causes the sentence actually imposed upon the defendant to rise above the prescribed statutory maximum. Id. at 1268-69.

We then applied this reasoning to 21 U.S.C. § 841(b). We noted that § 841(b)(1)(C) "provides a statutory penalty range applicable to all drug offenses involving the controlled substances listed on schedules I or II without regard to drug quantity," id. at 1268, and we consequently concluded that Apprendi does not apply when the defendant's sentence falls into that statutory penalty range, meaning that there is no need to have drug quantity charged in the indictment, submitted to the jury, or proven beyond a reasonable doubt in that context, id. at 1269-70. We went on to rule that there is constitutional error under Apprendi in a

22

21 U.S.C. § 841 case only when the sentencing judge's factual finding actually increased the defendant's sentence above the statutory maximum found in § 841(b)(1)(C), and only when the fact that led to the enhanced sentence was not charged in the federal indictment[15] or submitted to the jury for proof beyond a reasonable doubt. Id. at 1270.

Applying this logic to 21 U.S.C. § 960(b), we point out that § 960(b)(3) "provides a statutory penalty range applicable to all drug offenses involving the controlled substances listed on schedules I or II without regard to drug quantity," the maximum term of which is 20 years imprisonment. See Sanchez, 269 F.3d at 1268. Given that 21 U.S.C. § 960 has a catchall penalty provision, § 960(b)(3), there is no Apprendi constitutional error if the sentencing judge's drug quantity finding led to the defendant receiving a sentence below the prescribed statutory maximum found in § 960(b)(3).[16] See id. at 1269-70. There is constitutional error

---

[15]In Sanchez, we noted that Apprendi itself did not settle whether drug quantity must be charged in the federal indictment when it increases the penalty for a crime beyond the prescribed statutory maximum. Sanchez, 269 F.3d at 1278 n.51. We concluded, however, that the logic of Apprendi requires that, when the sentencing judge's drug-quantity finding actually increased the defendant's sentence beyond the prescribed statutory maximum, the drug quantity should have been charged in the federal indictment. Id. at 1278 n.52; see also Cotton, __ U.S. at __, 122 S. Ct. at 1783 (noting that "[i]n federal prosecutions, such facts must also be charged in the indictment").

[16]Even if there is constitutional error under Apprendi, we have held that "an Apprendi error does not require reversal of the sentence if that error is harmless." Anderson, 289 F.3d at 1326. And, if the defendant fails to raise the Apprendi issue in a timely manner, our review is limited to whether there was plain error. Cotton, U.S. at __, 122 S. Ct. at 1785.

23

under Apprendi, moreover, in the 21 U.S.C. § 960 context only if the sentencing judge's factual finding actually increased the defendant's sentence above the statutory maximum found in § 960(b)(3), and only if the fact that led to the enhanced sentence was not charged in the federal indictment or submitted to the jury for proof beyond a reasonable doubt.  See id.

4.    Application of These Principles to the Appellants' Argument

With these principles in mind, we reject the appellants' facial challenge to 46 U.S.C. app. § 1903 under Apprendi.  In so far as the appellants attack § 1903 as unconstitutional because it incorporates 21 U.S.C. § 960, they cannot demonstrate "that no set of circumstances exist under which the Act would be valid."  United States v. Mena, 863 F.2d 1522, 1527 (11th Cir. 1989) (citation omitted).  As we have explained, in most sentencing scenarios under 21 U.S.C. § 960, Apprendi is irrelevant because the sentence actually imposed will fall below the prescribed statutory maximum found in the catchall provision, § 960(b)(3).

Indeed, the appellants' circumstances in this case are examples of circumstances under § 960(b) that pass constitutional muster.  With respect to Hernandez, he was sentenced to a term of 200 months (16.67 years) imprisonment, and so Apprendi is irrelevant to his case because his sentence falls below the 20-year statutory maximum found in § 960(b)(3).  In contrast, Estupinan was

sentenced to a term of 252 months (21 years), thereby placing his sentence above the § 960(b)(3) statutory maximum. Nevertheless, Estupinan's situation is not an example of Apprendi constitutional error. Estupinan's enhanced sentence resulted from the drug quantity that he was found to have possessed in this case, five or more kilograms of cocaine. See 21 U.S.C. § 960(b)(1)(B)(ii) (authorizing term of imprisonment between ten years and life when the conviction involves five or more kilograms of cocaine). Both counts of the superceding indictment in this case made reference to that particular drug quantity. The first count of the indictment charged that each of the four defendants,

> while on board a vessel subject to the jurisdiction of the United States, . . . did knowingly and willfully conspire and agree, with other persons, both known and unknown to the grand jury, to knowingly and intentionally possess with the intent to distribute <u>five (5) kilograms or more</u> of a mixture or substance containing a detectable amount of cocaine, a controlled substance

in violation of 46 U.S.C. app. § 1903(a), (g), and (j). R1-39 (emphasis added). The second count charged that each defendant, "while on board a vessel subject to the jurisdiction of the United States, . . . did knowingly and intentionally possess with the intent to distribute, <u>five (5) kilograms or more</u> of a mixture or substance containing a detectable amount of cocaine, a controlled substance," in violation of 46 U.S.C. app. § 1903(a), (g) and 18 U.S.C. § 2. Id. (emphasis added). The jury

25

instructions also specifically referenced the drug quantity involved. Supp. R1-7-8. Additionally, in rendering its verdict, the jury made a special finding with respect to Estupinan that the drug quantity for which the he was being convicted was five or more kilograms of cocaine. R2-125. It follows that, even though Estupinan was sentenced to a term of imprisonment above the § 960(b)(3) statutory maximum, there was no Apprendi constitutional error because the drug quantity involved was charged in the federal indictment and submitted to the jury for proof beyond a reasonable doubt. In sum, the appellants have failed to demonstrate that Apprendi provides a basis for facially striking down 21 U.S.C. § 960 and, by extension, 46 U.S.C. app. § 1903; indeed, their own sentences are examples of situations where there is no Apprendi error in the § 960 and § 1903 contexts.

B.    The Constitutionality of 46 U.S.C. app. § 1903(f) in Light of the *Gaudin* Decision

1.    The Statutory Framework

In this subsection, we analyze the effect of the Supreme Court's Gaudin decision on the constitutionality of the MDLEA jurisdiction and venue provision, 46 U.S.C. app. § 1903(f), which removes from the jury the question of whether a vessel is subject to the jurisdiction of the United States. As in the previous section, we begin with the language of the statute. See Prather, 205 F.3d at 1269. Section 1903(a), among other things, defines the substantive offense of "possession with

26

intent to manufacture or distribute controlled substances on board vessels," and, in

so doing, states that such possession is unlawful when it occurs "on board a vessel

subject to the jurisdiction of the United States." 46 U.S.C. app. § 1903(a).[17]

Section 1903(c)(1)(A), in turn, states that a "vessel subject to the jurisdiction of the

United States" includes a "a vessel without nationality." 46 U.S.C. app. §

1903(c)(1)(A). A "vessel without nationality" is defined in § 1903(c)(2) as:

> (A) a vessel aboard which the master or person in
> charge makes a claim of registry, which claim is denied
> by the flag nation whose registry is claimed;
> (B) any vessel aboard which the master or person in
> charge fails, upon request of an officer of the United
> States empowered to enforce applicable provisions of
> United States law, to make a claim of nationality or
> registry for that vessel; and
> (C) a vessel aboard which the master or person in
> charge makes a claim of registry and the claimed nation
> of registry does not affirmatively and unequivocally
> assert that the vessel is of its nationality.

46 U.S.C. app. § 1903(c)(2).

Building on this statutory framework, Congress amended the MDLEA in

1996, choosing to add a new subsection, § 1903(f), entitled "Jurisdiction and

Venue." See Coast Guard Authorization Act of 1996, Pub. L. 104-324, §

1138(a)(5), 110 Stat. 3901 (1996). Section 1903(f) provides that "[j]urisdiction of

the United States with respect to vessels subject to this chapter is not an element of

---

[17]See supra note 11 for the full text of 46 U.S.C. app. § 1903(a).

any offense." 46 U.S.C. app. § 1903(f). The section further states: "All jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." Id.

2.  The Appellants' Argument

In light of these statutory provisions, the four defendants filed another motion to dismiss the indictment, challenging the constitutionality of the MDLEA jurisdiction and venue provision, 46 U.S.C. app. § 1903(f). They also objected at trial to the district court's decision to instruct the jury that the defendants' vessel was subject to the jurisdiction of the United States as a matter of law. Essentially, the defendants argued that § 1903(f), by taking the jurisdictional issue away from the jury, violated the principles laid down in the Supreme Court's Gaudin decision. Prior to Gaudin, the Supreme Court held that the Due Process Clause and the Sixth Amendment right to a jury trial provide a defendant who is charged with a serious offense with the constitutional right to insist that his guilt be determined beyond a reasonable doubt by a jury. Sullivan v. Louisiana, 508 U.S. 275, 277-78, 113 S. Ct. 2078, 2080-81 (1993); In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1072-73 (1970). Reiterating these basic principles, the Supreme Court in Gaudin held that the Constitution "require[s] criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which

28

he is charged, beyond a reasonable doubt." 515 U.S. at 510, 115 S. Ct. at 2313.

More specifically, the Gaudin Court held that if there are either factual questions or mixed questions of law and fact with respect to any element of an offense, the defendant has suffered an infringement upon his constitutional rights if those questions are not submitted to the jury for proof beyond a reasonable doubt. Id. at 511-15, 522-23, 115 S. Ct. at 2314-16, 2320. Finding that these principles were not violated by 46 U.S.C. app. § 1903(f), the district court denied the defendants' motion to dismiss the indictment. At the close of the all the evidence at trial, the district court instructed the jury that the defendants' vessel was subject to the jurisdiction of the United States as a matter of law.

On appeal, Hernandez and Estupinan raise their Gaudin argument, contending that 46 U.S.C. app. § 1903(f) unconstitutionally removes from the jury the determination of whether the government has proven beyond a reasonable doubt that the vessel at issue in a given case is a vessel subject to the jurisdiction of the United States. To buttress their position, the appellants point to our decision in United States v. Medina, a decision that was handed down prior to the 1996 amendment of the MDLEA, in which we held that the jurisdictional issue in MDLEA cases is an element of a § 1903(a) offense, and, consequently, that whether a vessel is subject to the jurisdiction of the United States is a question of

29

fact that the jury must decide. 90 F.3d 459, 463-64 (11th Cir. 1996). The appellants further assert that Congress through amendment cannot simply label jurisdiction a non-element in § 1903(f). Rather, they contend that the structure of § 1903(a), which includes the phrase "a vessel subject to the jurisdiction of the United States" within its definition of an MDLEA offense, mandates that the jurisdictional question be treated as a substantive element of the offense that the jury must decide. Additionally, the appellants argue that once Congress required the government to prove that a vessel is subject to the jurisdiction of the United States before a conviction can be obtained, it necessarily created an offense element that cannot arbitrarily be removed from the jury. Finally, the appellants contend that, because the MDLEA jurisdictional issue is a fact-bound determination, Gaudin requires that it be submitted to the jury for proof beyond a reasonable doubt.

3.    The Effect of the 1996 Amendment to the MDLEA on our Medina Decision

Whether a provision of a statute is constitutional is a question of law that we review de novo. Cespedes, 151 F.3d at 1331. As we shall explain, the defendants' Gaudin challenge to 46 U.S.C. app. § 1903(f) is misplaced. Our analysis begins with Medina, which the appellants reference in an effort to show that the

30

Constitution requires that the jurisdictional requirement of the MDLEA be treated as an element of the offense that the jury has to decide. It is true that in Medina we concluded that the issue of whether a vessel is subject to the jurisdiction of the United States should be treated as an element of a § 1903(a) offense that has to be submitted to the jury and proven beyond a reasonable doubt. Medina, 90 F.3d at 463-64; see also United States v. Ayarza-Garcia, 819 F.2d 1043, 1048-49 (11th Cir. 1987) (holding that the jurisdictional requirement under 21 U.S.C. § 955a(a), the predecessor provision to 46 U.S.C. app. § 1903(a), was an element of the offense that had to be submitted to the jury and proven beyond a reasonable doubt). We reached this conclusion because the MDLEA jurisdictional language — "a vessel subject to the jurisdiction of the United States" — is included in the provision that defines MDLEA substantive offenses, 46 U.S.C. app. § 1903(a). Medina, 90 F.3d at 463-64. We concluded that Ayarza-Garcia, 819 F.2d at 1048-49, which dealt with the predecessor statute to 46 U.S.C. app. § 1903, controlled our decision. Medina, 90 F.3d at 463-64. In that case, we treated the jurisdictional language contained in the provision that defined the crime as a substantive offense element that the government had to prove beyond a reasonable doubt to the jury. Id.

Our Medina decision also contained more-abstract language that addressed

the issue of when, generally speaking, statutory jurisdictional provisions should be submitted to the jury for proof beyond a reasonable doubt. We stated "that when a question — for example, whether a vessel is without nationality — of federal subject-matter jurisdiction is intermeshed with questions on the merits of a case, the jurisdictional issue should be determined at trial (per Rule 29 or by jury)." Id. at 463;[18] see also Ayarza-Garcia, 819 F.2d at 1048-49. Put another way, Medina

---

[18]We explained in Alikhani v. United States:

> "Subject matter jurisdiction defines the court's authority to hear a given type of case. . . . United States v. Morton, 467 U.S. 822, 828, 104 S. Ct. 2769, 2773, 81 L.Ed.2d 680 (1984). Congress bestows that authority on lower courts by statute; in [criminal] case[s], Congress has provided the district courts with jurisdiction — "exclusive of the courts of the States" — of "all offenses against the laws of the United States." 18 U.S.C. § 3231.

200 F.3d 732, 734 (11th Cir.) (per curiam), cert. denied, 531 U.S. 929, 121 S. Ct. 309 (2000). As we pointed out in McCoy v. United States, it is true that "[s]ubject matter jurisdiction in every federal criminal prosecution comes from 18 U.S.C. § 3231," and, in almost all criminal cases, "[t]hat's the beginning and the end of the 'jurisdictional' inquiry." 266 F.3d 1245, 1252 n.11 (11th Cir. 2001) (citation omitted), cert. denied, __ U.S. __, 122 S. Ct. 2362 (2002). Congress, however, can create additional statutory hurdles to a court's subject matter jurisdiction through separate jurisdictional provisions found in the substantive criminal statute itself under which a case is being prosecuted. The best illustrations of this principle arise in the civil context, but the illustrations apply equally as well to the criminal context. For instance, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq, in addition to the substantive elements of a claim, the plaintiff must demonstrate that the defendant fits within the Act's definition of "employer," as defined in § 2000e(b). We have held that the issue of whether the defendant is an "employer" "does not implicate an element of the Title VII cause of action" but is instead a threshold issue of subject matter jurisdiction for the court to decide. Scarfo v. Ginsberg, 175 F.3d 957, 961 (11th Cir. 1999). Thus, even though, generally speaking, a district court has jurisdiction of a civil case if the case presents a federal question under 28 U.S.C. § 1331, Title VII provides an additional statutory requirement of subject matter jurisdiction in 42 U.S.C. § 2000e(b). Similarly, as we shall explain more fully later in this opinion, 46 U.S.C. app. § 1903 of the MDLEA creates an additional statutory requirement of subject matter jurisdiction — that the vessel at issue be subject to the jurisdiction of the United States — above and beyond the general jurisdictional requirement imposed upon district courts by 18 U.S.C. § 3231.

32

stated that, in cases where questions of subject matter jurisdiction are inextricably interwoven with the substantive elements of a criminal offense, the issue of jurisdiction is one for the jury to decide. We have reached this same conclusion with regard to jurisdictional issues in other contexts as well. See United States v. Castleberry, 116 F.3d 1384, 1389 (11th Cir. 1997) (indicating that the showing of an effect on interstate commerce is a substantive element of Hobbs Act offenses that must be decided by the jury); United States v. Perrin, 580 F.2d 730, 737 (5th Cir. 1978) (indicating that the use of interstate facilities is a substantive element of Travel Act offenses that must be decided by the jury).

The Medina decision, however, occurred in an atmosphere of congressional silence. At the time of the decision, Congress was silent as to whether the MDLEA jurisdictional requirement was a matter of subject matter jurisdiction as well as a substantive element of a 46 U.S.C. app. § 1903(a) offense. Congress had not yet added § 1903(f) to the MDLEA, and so we had to infer whether Congress intended for the jurisdictional question to constitute both a question of subject matter jurisdiction and an element of an MDLEA offense. We did this by analyzing the statutory structure, an analysis that was made somewhat easier as a result of our interpretation of the similarly worded predecessor statute in Ayarza-Garcia. The proper inference to be drawn from that structure, however, was far from self-

evident, for in cases preceding Medina, we called attention to the fact that there was conflicting circuit precedent over whether the MDLEA jurisdictional requirement, in addition to being a matter of subject matter jurisdiction, was meant to be a substantive element of the offense. See United States v. Rojas, 53 F.3d 1212, 1215 n.2 (11th Cir. 1995); Mena, 863 F.2d at 1532-33 & n.8.

From the foregoing discussion, it is clear that our Medina decision was a case about statutory construction, not about the limits of congressional power to define the elements of an offense, as the appellant would have us suppose. Because we decided that the statutory structure indicated that the jurisdictional question was meant to be treated as both a matter of subject matter jurisdiction and as an offense element, there was no need to discuss whether Congress, if it so chose, could mandate that the jurisdictional requirement be treated solely as a matter of subject matter jurisdiction. The situation has changed, however, since the time of Medina. The 1996 Amendment to the MDLEA removes the statutory ambiguity that existed at the time we rendered that decision. By adding to the MDLEA the jurisdiction and venue provision, 46 U.S.C. app. § 1903(f), Congress, as we have pointed out, plainly indicated that whether a vessel is subject to the jurisdiction of the United States is not an element of the offense, but instead is solely an issue of subject matter jurisdiction that should be treated as a preliminary

34

question of law for the court's determination. 46 U.S.C. app. § 1903(f). It is true beyond peradventure that Congress has the constitutional authority to "overrule" a court interpretation of a statute by amending the statute. Henderson v. Scientific-Atlanta, Inc., 971 F.2d 1567, 1571-72 (11th Cir. 1992). As a result, we conclude that Congress, by amending 46 U.S.C. app. § 1903(f), effectively overruled our statutory construction of the § 1903 jurisdictional requirement in Medina. The statutory language of the MDLEA now unambiguously mandates that the jurisdictional requirement be treated only as a question of subject matter jurisdiction for the court to decide.[19] Thus, we now must address the issue that did not arise in Medina: whether Congress can constitutionally provide that the MDLEA jurisdictional requirement is a non-element of the offense, thereby authorizing the judge to decide the issue, rather than the jury.[20]

   4.    Limitations on the Congressional Power to Remove Issues from the

---

[19]Of course, our conclusion here does not affect convictions under 46 U.S.C. app. § 1903 that occurred before § 1903(f) was added to the MDLEA, convictions that still are governed by Medina.

[20]We further note that the issue never arose in Gaudin, given that the government conceded that Congress intended for materiality to be treated as an element of a 18 U.S.C. § 1001 offense. 515 U.S. at 511, 115 S. Ct. at 2314. Gaudin only addressed the issue of whether a particular element — materiality — had to be submitted to the jury for proof beyond a reasonable doubt, not the issue of whether Congress could label materiality a non-element of the offense for the judge to decide. See Gaudin, 515 U.S. at 525, 115 S. Ct. at 2321 (Rehnquist, J., concurring) (suggesting that outcome would have been different had the legislature defined materiality as a non-element of the offense). Thus, Gaudin does not directly speak to the issue raised herein, and the appellants' heavy emphasis on Gaudin is misplaced.

35

Jury's Determination

We begin our constitutional analysis by noting that, "[w]ithin broad constitutional limits, the definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." Sanchez, 269 F.3d at 1263 n.20 (internal quotation marks and brackets omitted); see also Staples v. United States, 511 U.S. 600, 604, 114 S. Ct. 1793, 1796 (1994). The legislature's decision on how to define the elements of the offense "is usually dispositive." McMillan v. Pennsylvania, 477 U.S. 79, 85, 106 S. Ct. 2411, 2415 (1986); see also Gaudin, 515 U.S. at 525, 115 S. Ct. at 2321 (Rehnquist, J., concurring). For instance, legislatures have great leeway in deciding whether a particular factual issue constitutes an element of an offense to be proven by the government, or whether it should be treated as an affirmative defense to be proven by the criminal defendant. See Martin v. Ohio, 480 U.S. 228, 233, 107 S. Ct. 1098, 1101-02 (1987); Patterson v. New York, 432 U.S. 197, 210, 97 S. Ct. 2319, 2327 (1977).

Nevertheless, although we show deference to legislatures in their decisions on how to define the elements of an offense, there are "certain limited circumstances" in which "facts not formally identified as elements of the offense charged" must be submitted to the jury and proven beyond a reasonable doubt.

36

McMillan, 477 U.S. at 86, 106 S. Ct. at 2416. Generally speaking, the legislature cannot relieve the government of proving beyond a reasonable doubt an "essential ingredient of the offense." Jones v. United States, 526 U.S. 227, 241, 119 S. Ct. 1215, 1223; see also Harris v. United States, __ U.S. __, __, 122 S. Ct. 2406, 2410 (2002) (noting that "constitutional guarantees attach to . . . facts" that are the "essential elements" of a given crime); In re Winship, 397 U.S. at 364, 90 S. Ct. at 1073 (stating that there must be "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged"). For example, as we explained in Part II.A., although legislatures have great flexibility in defining certain facts as sentencing factors rather than an offense elements, McMillan, 477 U.S. at 85, 106 S. Ct. at 2415, the legislature cannot label facts as sentencing factors if those facts are used to enhanced the defendant's sentence beyond the prescribed statutory maximum, Apprendi, 530 U.S. at 490, 102 S. Ct. at 2362-63. Additionally, once the legislature has defined certain facts as elements of the offense, the legislature cannot shift the burden of persuasion as to those elements to the defendant, nor can the legislature create any presumptions as to those elements that negate the defendant's presumption of innocence. See McMillan, 477 U.S. at 86-87, 106 S. Ct. at 2416-17; Patterson, 432 U.S. at 215, 97 S. Ct. at 2329.

37

Furthermore, the Supreme Court has suggested that when certain types of facts, though labeled as something other than elements by the legislature, are "traditional elements" of an offense, the constitutional safeguards provided by the Due Process Clause and the Sixth Amendment right to a jury trial still may apply. Jones, 526 U.S. at 241-42, 119 S. Ct. at 1223; see also Harris, __ U.S. at __, 122 S. Ct. at 2414 . The Supreme Court has indicated that facts are traditional elements when there is a strong common-law tradition of treating those types of facts as something that must be proven to a jury beyond a reasonable doubt. See Harris, __ U.S. at __, 122 S. Ct. at 2416 (noting that its conclusion that facts used to establish a mandatory minimum sentence need not be submitted to a jury for proof beyond a reasonable doubt "might be questioned if there were extensive historical evidence showing that facts increasing the defendant's minimum sentence . . . have, as a matter of course, been treated as elements"); Apprendi at 476-85, 120 S. Ct. at 2355-60 (discussing the common-law tradition as part of its analysis of whether facts that enhance a defendant's sentence must be proven to jury beyond a reasonable doubt).

5.      Application of These Principles to the Appellants' Argument

With these principles in mind, we analyze whether Congress acted constitutionally in adding 46 U.S.C. app. § 1903(f) to the MDLEA, which provides

that the question of whether a vessel is subject to the jurisdiction of the United States should be treated purely as an issue of subject matter jurisdiction for the court to decide. To begin, we note that the present situation is not one in which Congress has labeled certain facts as sentencing facts rather than offense elements; thus, the unique proscription upon legislative power in defining crimes that was set forth in Apprendi, 530 U.S. at 490, 102 S. Ct. at 2362-63, is not applicable here. Neither is this a case in which Congress has shifted the burden of persuasion with respect to an offense element to the defendant, nor is it one in which Congress has otherwise created any presumptions as to offense elements that negate the defendant's presumption of innocence. Thus, the teachings of McMillan, 477 U.S. at 86-87, 106 S. Ct. at 2416-17, and Patterson, 432 U.S. at 215, 97 S. Ct. at 2329, have no bearing on the present situation. We turn, then, to whether the MDLEA jurisdictional requirement raises factual questions that traditionally would have been treated as elements of an offense under the common law, thereby triggering the constitutional safeguards provided by the Due Process Clause and the Sixth Amendment right to a jury trial. Jones, 526 U.S. at 241-42, 119 S. Ct. at 1223; see also Harris, __ U.S. at __, 122 S. Ct. at 2414 .

We conclude that the MDLEA jurisdictional requirement does not raise factual questions that traditionally would have been treated as elements of an

39

offense under the common law. As used in the common law, the "elements" of an offense include each part of the actus reus, causation, and the mens rea that the government must establish before an individual can be found guilty of a crime. See Black's Law Dictionary 520 (6th ed. 1990) (defining "Elements of crime" in part as "[a] term used by the common law to refer to each component of the actus reus, causation, and the mens rea that must be proved in order to establish that a given offense has occurred"); see also Morissette v. United States, 342 U.S. 246, 251-52, 72 S. Ct. 240, 244 (1952) ("Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil."); People v. Torres, 848 P.2d 911, 914 (Colo. 1993) (en banc) ("Generally, in order to subject a person to criminal liability, there must be a concurrence of the actus reus, an unlawful act, and the mens rea, a culpable mental state.") (emphasis in original); Garnett v. State, 632 A.2d 797, 800 (Md. 1993) ("At common law, a crime occurred only upon the concurrence of an individual's act and his guilty state of mind.").

The requirement under 46 U.S.C. app. § 1903 that a vessel be subject to the jurisdiction of the United States, however, does not go to the actus reus, causation, or the mens rea of the defendant. We reach this conclusion based in part on the

reasoning in United States v. Gonzalez, 776 F.2d 931 (11th Cir. 1985), where we interpreted the predecessor statute to 46 U.S.C. app. § 1903, the Marijuana on the High Seas Act, 21 U.S.C. § 955a-d. In Gonzalez, we discussed the jurisdictional requirement of § 955a(c), under which the "Coast Guard [was authorized to] seek permission from foreign governments to prosecute foreign nationals found on foreign vessels on the high seas." 776 F.2d at 935. In discussing this jurisdictional requirement premised on consent from a foreign government, we noted that the requirement was not mandated by either international law or treaty. Id. at 940. Rather, we noted that Congress, under the "protective principle" of international law, may assert extraterritorial jurisdiction over vessels in the high seas that are engaged in conduct that "has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems." Id. at 939. We further stated that the jurisdictional requirement was inserted into the statute as a diplomatic courtesy to foreign nations and as a matter of international comity in order to avoid "friction with foreign nations." Id. at 940. This, in turn, led us to the conclusion that it was misleading to view the jurisdictional requirement as a necessary element of the offense, rather than as "a diplomatic requisite illustrating the international partnership that ensures the rule of law on the high seas." Id.; see also United States v. Devila, 216 F.3d 1009,

1017 (11th Cir. 2000) (per curiam), vacated in part on other grounds, 242 F.3d 995 (11th Cir.), cert. denied, __ U.S. __, 122 S. Ct. 103 (2001) (noting that the jurisdictional requirement that a foreign nation consent to or waive objection to United States enforcement under 46 U.S.C. app. § 1903 was inserted into the statute "to protect the interest of th[e] flag nation and international comity, not the interest of the individuals aboard the vessel").

These statements demonstrate that the statutory jurisdictional requirement contained in 46 U.S.C. app. § 1903 is unique because it is not meant to have any bearing on the individual defendant, but instead is meant to bear only on the diplomatic relations between the United States and foreign governments.  Based on the reasoning of Gonzalez, it is clear that the statutory jurisdictional requirement is an ancillary consideration that was enacted as part of the statute in order to promote smooth relations between sovereigns in the domain of international waters.

The § 1903 jurisdictional requirement, therefore, does not constitute a traditional element of an offense, given that it has nothing to do with the "concurrence of an evil-meaning mind with an evil-doing hand" as reflected in the common law.  Morissette, 342 U.S. at 251, 72 S. Ct. at 244.  The § 1903 jurisdictional requirement does not affect the defendant's blameworthiness or

culpability, which is based on the defendant's participation in drug trafficking activities, not on the smoothness of international relations between countries. See United States v. Klimavicius-Viloria, 144 F.3d 1249, 1257 (9th Cir. 1998) (concluding that jurisdictional nexus requirement imposed by Ninth Circuit in MDLEA cases is to be decided by judge because it does not go to the guilt or innocence of defendant); see also United States v. Webster, 162 F.3d 308, 330 (5th Cir. 1999) (noting that jurisdictional issues do not aid "in singling out the guilty from the innocent or in deterring future conduct"); United States v. Bryant, 766 F.2d 370, 375 (8th Cir. 1985) (noting that jurisdictional issues do not affect the blameworthiness or culpability of the defendant, for "the offense is still every bit as grave in the moral sense" even absent the jurisdictional provision). For these reasons, the § 1903 jurisdictional requirement is unlike the actus reus, causation, and the mens rea components that make up the traditional offense elements as historically understood in this country.

The Supreme Court case of Ford v. United States, 273 U.S. 593, 47 S. Ct. 531 (1927), which involved a jurisdictional issue similar to the one in this case, buttresses our position. Ford is like the instant case in that it involved a ship that had been seized at sea for carrying contraband, namely, liquor during the Prohibition era. One issue in the case was whether the ship had been seized within

the area designated by a treaty to which the United States and Great Britain were the parties. The Supreme Court held that the question of whether the defendants' ship had been seized within the area delineated by the treaty was for the judge to decide, since the issue was one of jurisdiction. Id. at 606, 47 S. Ct. at 535. The Court reasoned that the jurisdictional issue "was necessarily preliminary to th[e] trial," given that "[t]he issue whether the ship was seized within the prescribed limit did not affect the question of the defendants' guilt or innocence. It only affected the right of the court to hold their persons for trial." Id.; see also Klimavicius-Viloria, 144 F.3d at 1257 (discussing Ford). Ford supports our determination that statutory jurisdictional requirements like the one in the MDLEA do not fit into the traditional definition of what constitute offense elements. Hence, the § 1903 jurisdictional requirement is not an essential ingredient or an essential element of the MDLEA substantive offense, and, as a result, it does not have to be submitted to the jury for proof beyond a reasonable doubt.[21]

_____

[21]Our decision in this case should not be read as answering the more difficult question of whether Congress could label as non-elements of an offense those so-called "jurisdictional" provisions that are inserted into statutes for the purpose of providing Congress with substantive authority under Article I of the Constitution to regulate the conduct at issue, or that are otherwise inserted into statutes to negate due process concerns. With respect to the present case, it is clear from our precedent that the 46 U.S.C. app. § 1903 jurisdictional requirement is not a necessary prerequisite for Congress's exercise of extraterritorial jurisdiction over drug trafficking activities that occur in international waters. In Gonzalez, we indicated that Congress has authority, under the "protective principle" of international law, to regulate drug-related activities on the high seas because such activities have "a potentially adverse effect and [are] generally recognized as a crime by nations that have reasonably developed legal systems." 776 F.2d at 939. This is true,

44

We note, furthermore, that we are not swayed by the appellants' contention that, since the MDLEA jurisdictional issue is a fact-bound determination, <u>Gaudin</u> requires that it be submitted to the jury for proof beyond a reasonable doubt. Contrary to the appellants' assertions, <u>Gaudin</u> never stated that all factual determinations must go the jury. Rather, <u>Gaudin</u> stands for the proposition that <u>elements</u> of an offense that involve factual determinations, or mixed determinations of law and fact, must go to the jury. 515 U.S. at 511-15, 522-23, 115 S. Ct. at 2314-16, 2320. If the factual determination has no bearing on an

---

we noted, even absent consent or a waiver of consent from a foreign government. <u>Id.</u> at 938. <u>Gonzalez</u>, moreover, indicates that compliance with the "protective principle" of international law is sufficient to meet the requirements of due process because a statute that so complies is not arbitrary or fundamentally unfair. <u>See id.</u> at 938-41 (rejecting defendant's due process challenge).

In contrast, other federal statutes often contain what is referred to as a "jurisdictional" element, though the element is not really a matter of the court's subject matter jurisdiction. Instead, the element is inserted into the statute to provide Congress with substantive authority under Article I of the Constitution, or to bring the statute into compliance with due process restraints. <u>See</u> <u>United States v. Krilich</u>, 209 F.3d 968, 972 (7th Cir.), <u>cert.</u> <u>denied</u>, 531 U.S. 992, 121 S. Ct. 482 (2000) (discussing such elements). For instance, many federal criminal statutes have a provision that requires a particularized, case-by-case factual finding that some product or activity of the defendant relate in some way to interstate commerce. <u>See, e.g.</u>, Hobbs Act, 18 U.S.C. § 1951(a) ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce . . . ."); Travel Act, 18 U.S.C. § 1952(a) ("Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce . . . ."). Because such provisions provide Congress with the constitutional power to criminalize the act, <u>see</u> <u>United States v. Lopez</u>, 514 U.S. 549, 561-62, 115 S. Ct. 1624, 1631 (1995), there can be no federal crime without the provisions, <u>see</u> <u>Krilich</u>, 209 F.3d at 972. Arguably, these provisions constitute "essential ingredient[s] of the offense," <u>Jones</u>, 526 U.S. at 241, 119 S. Ct. at 1223, and are "essential elements" of the crime, <u>Harris</u>, __ U.S. at __, 122 S. Ct. at 2410, and thus may trigger the constitutional safeguards imposed by the Due Process Clause and the Sixth Amendment right to a jury trial. We need not resolve this issue, however, given that the 46 U.S.C. app. § 1903 jurisdictional provision does not fall into the same category as the statutory jurisdictional provisions in statutes such as the Hobbs Act and the Travel Act.

45

element of the offense, the principles laid down in Gaudin do not apply. See id. at

525-26, 115 S. Ct. at 2321 (Rehnquist, J., concurring) (pointing out that, even after

Gaudin, many factual determinations still can be made by the judge, as in the

context of "[p]reliminary questions in a trial regarding the admissibility of

evidence, the competency of witnesses, the voluntariness of confessions, the

legality of searches and seizures, and the propriety of venue") (internal citations

omitted). Hence, although fact-bound determinations may be involved, that does

not automatically mean that the 46 U.S.C. app. § 1903 jurisdictional issue has to be

decided by the jury. Whether an issue involves factual determinations, in other

words, is not talismanic with respect to the question of whether Congress can

remove a particular question from the jury's determination. Consequently, even if

questions under the 46 U.S.C. app. § 1903 jurisdictional requirement may have a

factual component, that component does not have to be resolved by the jury, given

that, as we have explained, the jurisdictional requirement goes only to the court's

subject matter jurisdiction and does not have to be treated as an element of a

MDLEA substantive offense.[22]

---

[22]Although made in the civil context, the following statement applies just as well in the criminal context. The statement concerns the court's fact finding role with respect to questions of whether the statutory requirements of subject matter jurisdiction have been met in a particular case:

> When faced with factual disputes regarding subject matter
> jurisdiction, the district court serves as the fact-finder and may

In sum, we reject the appellants' argument that the MDLEA, 46 U.S.C. app. § 1903(f), is unconstitutional under <u>Gaudin</u> and other related cases. Although the

weigh the evidence, provided that the challenge to subject matter jurisdiction does not implicate an element of the cause of action. Because subject matter jurisdiction addresses the power of the court to hear a case, a jury does not resolve factual issues regarding subject matter jurisdiction. Instead, that duty is for the court.

<u>Scarfo</u>, 175 F.3d at 961 (internal citation omitted).

We also note that our rejection of the appellants' argument concerning the fact-bound nature of 46 U.S.C. app. § 1903 jurisdictional determinations appears to put us in conflict with one of our sister circuits. In <u>United States v. Smith</u>, 282 F.3d 758, 765-68 (9th Cir. 2002), one of the issues on appeal involved 46 app. § 1903(c)(1)(D), which provides that "a vessel located in the customs waters of the United States" constitutes a "vessel subject to the jurisdiction of the United States." 46 U.S.C. app. § 1903(c)(1)(D). The district court, pursuant to § 1903(f), decided the the defendant's vessel was subject to the jurisdiction of the United States under the MDLEA because the vessel was within United States customs waters at the time it was intercepted. <u>Id.</u> at 765. The Ninth Circuit concluded that the district court erred by taking the issue of whether the § 1903 jurisdictional requirement had been met completely away from the jury. <u>Id.</u> at 766-68. The court construed § 1903(f) to mean that the "jurisdictional issue" of "whether the United States had jurisdiction over the waters where a vessel is allegedly intercepted" is to be decided by the judge, while as the "factual issue" of "whether the vessel was actually intercepted in those waters" is to be decided by the jury. <u>Id.</u> at 767. In so construing § 1903(f), the Ninth Circuit referenced <u>In re Winship</u>, which, it maintained, stands for the proposition that factual issues must be decided by the jury. <u>Id.</u>

Generally speaking, the Ninth Circuit's interpretation of § 1903(f) suggests that particularized, case-specific factual determinations that have to be made as part of the MDLEA jurisdictional inquiry are to be decided by the jury. We respectfully disagree with the Ninth Circuit's interpretation. The plain language of § 1903(f) states: "<u>All</u> jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. app. § 1903(f) (emphasis added). To interpret the unambiguous phrase "[a]ll jurisdictional issues" so as not to encompass the determination of jurisdictional facts conflicts with the plain meaning of the statute, which we are bound to follow unless it leads to absurd results. <u>See</u> <u>United States v. Carrell</u>, 252 F.3d 1193, 1198 (11th Cir. 2001) ("In statutory construction, the plain meaning of the statute controls unless the language is ambiguous or leads to absurd results.") (internal quotation marks omitted). Furthermore, as we have explained, just because an issue involves fact-bound determinations does not in itself mean that the Constitution requires that the issue be determined by the jury. <u>See</u> <u>Gaudin</u>, 515 U.S. at 525-26, 115 S. Ct. at 2321 (Rehnquist, J., concurring). Thus, the Ninth Circuit's reference to <u>In re Winship</u> is misplaced.

Due Process Clause and the Sixth Amendment right to a jury trial require that each element of a criminal offense be submitted to the jury for proof beyond a reasonable doubt, Congress made clear through the 1996 amendment to the MDLEA that the jurisdictional requirement is not an element of a § 1903(a) substantive offense, but rather is an issue that goes only to the subject matter jurisdiction of the federal courts. We also have concluded that Congress had the flexibility under the Constitution, at least with respect to the statutory jurisdictional requirement at issue in this case, to decide that the jurisdictional issue should be solely one of subject matter jurisdiction for the court to decide, and not an element of the MDLEA substantive offense. This is because the jurisdictional provision here is not a traditional element, or otherwise an essential ingredient, of a criminal offense.

C.     The District Court's Decision as a Matter of Law that the Appellants' Vessel Constituted a Vessel Subject to the Jurisdiction of the United States under the MDLEA

In this subsection, we address whether the district court erred in concluding that, as a matter of law, the statutory requirements for subject matter jurisdiction imposed by 46 U.S.C. app. § 1903 were met in this case. Section 1903(c)(1)(A) states that "a vessel without nationality" is included within the definition of a vessel subject to the jurisdiction of the United States. 46 U.S.C. app. §

48

1903(c)(1)(A). A vessel is without nationality if, among other things, "the master or person in charge makes a claim of registry and the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. app. § 1903(c)(2)(C). Moreover, the "claim of registry . . . may be verified or denied [by the claimed nation of registry] by radio, telephone, or similar oral or electronic means." 46 U.S.C. app. § 1903(c)(2).

Based on these statutory provisions, the four defendants, shortly after their indictment, took the position that there was insufficient proof that the vessel at issue in this case was a vessel without nationality, and thus insufficient proof that the vessel was subject to the jurisdiction of the United States. Accordingly, in addition to the two motions to dismiss the indictment discussed earlier in this opinion, the defendants filed a motion to dismiss the indictment on the ground that the statutory requirements for subject matter jurisdiction imposed by 46 U.S.C. app. § 1903 had not been met. The district court denied the defendants' motion. Later, after a pre-trial hearing was held, the court ruled that the government had made out a prima facie case that the vessel was subject to the jurisdiction of the United States as a vessel without nationality. Thereafter, following a trial that included testimony concerning the jurisdictional issue,[23] the district court,

_____

[23]Before the trial began, the district court ruled that it would allow the four defendants to cross-examine government witnesses about the jurisdictional issue at the trial in the presence of

implicitly holding that there was sufficient proof that the 46 U.S.C. app. § 1903 jurisdictional requirement had been met, instructed the jury that defendants' vessel was subject to the jurisdiction of the United States as a matter of law.

On appeal, Hernandez and Estupinan argue that — even if it was proper under 46 U.S.C. § 1903(f) for the district court to decide that the vessel at issue in this case was a vessel subject to the jurisdiction of the United States — the court erred in its conclusion that the § 1903 statutory requirement for subject matter jurisdiction had been established under the circumstances here. In making their argument, the appellants focus on the Declaration of Karl Schultz, Coast Guard Liaison Officer to the Bureau for International Narcotics and Law Enforcement, United States Department of State.[24] They place emphasis on the Schultz Declaration because the district court relied on that document in ruling that the government had made out a prima facie case that the § 1903 jurisdictional requirement had been met, and presumably in instructing the jury that the requirement had been met as a matter of law in this case.

The Schultz Declaration states that, when the Coast Guard requested that the

---

the jury, but that any arguments made by the attorneys concerning jurisdiction were to occur outside the jury's presence. Furthermore, the district court ruled that any witness called to testify solely on the jurisdictional issue was to be questioned outside the presence of the jury.

[24]See supra note 4.

50

Colombian Navy attempt to verify the verbal claims of Tinoco and Hoard that the vessel was registered in Colombia, the Colombian Navy responded that it needed the name and registration number of the vessel before it could confirm or refute the verbal claims. Schultz Decl., R2-122 Exh. 20 at 3. According to the Schultz Declaration, the Coast Guard then told the Colombian Navy that it was unable to provide any more detailed information, since there were no identifying marks on the vessel or any registration documents found on board. Id. The Schultz Declaration relates that the Coast Guard also told the Colombian Navy that "the four crewman aboard the vessel refused to provide any information pertaining to their personal identification or that of the vessel." Id. Finally, the Schultz Declaration explains that, upon receiving this information from the Coast Guard, the Colombian Navy stated that it could neither confirm nor deny the verbal claim of Colombian registry made by Tinoco and Hoard. Id. Based on this answer from the Colombian Navy, the government has been able to argue that the vessel at issue was subject to the jurisdiction of the United States as a vessel without nationality: "the master or person in charge" of the vessel, Tinoco, made "a claim of registry" that the vessel was of Colombian origin, and "the claimed nation of registry," Colombia, did not "affirmatively and unequivocally assert that the vessel [was] of its nationality." 46 U.S.C. app. § 1903(c)(2)(C).

51

The appellants maintain, however, that the requirements of § 1903(c)(2)(C) were not met because the Colombian Navy's failure to confirm or deny the registration of the vessel at issue resulted from the bad faith of the Coast Guard. They argue that the record shows that, when asked questions by RHI Boarding Officers Burke and Harrington about the nationality of the vessel and its crew, Tinoco and Hoard fully cooperated and informed the officers that the vessel crew members and the vessel were of Colombian origin, and that they were headed for the Galapagos Islands. They also contend that the record shows that the RHI boarding team was able to obtain the passports of the four vessel crew members. All of this information gathered about the vessel and its crew, the appellants maintain, was provided to Officer Barrows, the operations officer aboard the Thetis cutter, who then relayed it to Coast Guard headquarters. According to the appellants, it follows that the Coast Guard knew that the crew members were cooperating and answering the questions posed to them when it began its diplomatic communications with the Colombian Navy.

Despite this fact, the appellants assert, the Coast Guard misled the Colombian Navy by stating that the vessel's crew members were refusing to provide any more information, thereby leading the Colombian Navy falsely to believe that any additional effort to obtain evidence of the vessel's name and

52

registration number would be futile. The appellants' argument, therefore, is that Colombian Navy's decision that it could neither confirm nor deny that the vessel was of Colombian origin was based on misinformation. Furthermore, they contend that the Coast Guard, upon being asked for additional information by the Colombian Navy, should have radioed to the Thetis crew to ask the vessel crew members whether they knew the name of the ship and its registration number. Accordingly, the appellants maintain that the § 1903 jurisdictional requirement was never complied with in this case, and so the district court lacked subject matter jurisdiction to hear the case.

We review de novo a district court's "interpretation and application of statutory provisions" that go to whether the court has subject matter jurisdiction. Chaney v. Tennessee Valley Auth., 264 F.3d 1325, 1326 (11th Cir. 2001) (per curiam). The district court's factual findings with respect to jurisdiction, however, are reviewed for clear error. Scarfo, 175 F.3d at 960. In reviewing the jurisdictional issue raised here, we note that the government bears the burden of establishing that the statutory requirements of subject matter jurisdiction imposed by the MDLEA have been met.[25] Yet, even though the government carries this

---

[25]Prior to the 1996 amendment that added 46 U.S.C. § 1903(f) to the MDLEA, it was clear that the government carried the burden of showing that a vessel is subject to the jurisdiction of the United States, given that we had concluded that the jurisdictional requirement was an element of the substantive offense. See Medina, 90 F.3d at 463. Even though under § 1903(f) it

53

burden, a certification by the Secretary of State or the Secretary's designee concerning a vessel's registry or lack thereof "constitutes rebuttable prima facie evidence of the facts certified." Devila, 216 F.3d at 1015 n.4.

Based on the record in this case, we conclude that the district court did not err in ruling that the government established that the vessel at issue was subject to the jurisdiction of the United States as a vessel without nationality under 46 U.S.C. app. § 1903(c)(2)(C). The appellants' position on appeal can be reduced to two separate contentions. The first contention is that the Coast Guard had a duty to investigate further when the Colombian Navy stated that it needed the vessel's name and registration number before it could verify the verbal claims of Colombian registry made by Tinoco and Hoard. The second contention is that the Coast Guard had a duty to act in good faith in its diplomatic communications with the Colombian Navy, a duty that the Coast Guard allegedly breached by providing

is now clear that the jurisdictional requirement goes only to the court's subject matter jurisdiction, we still conclude that the government carries the burden on the jurisdictional issue. Cf. United States v. Shearer, 794 F.2d 1545, 1551 (11th Cir. 1986)(noting that government carries the burden of showing venue).

We further note that under our prior precedent, the government had to prove the jurisdictional requirement beyond a reasonable doubt. See Medina, 90 F.3d at 463. Now that § 1903(f) makes clear that the jurisdictional requirement is not an element of the substantive offense, the question arises of whether the government must establish the jurisdictional requirement beyond a reasonable doubt or by a preponderance of the evidence. We need not resolve this issue, however, since we conclude that the government has met the higher standard of proof in this case. See Griffin v. United States, 588 F.2d 521, 530 n.19 (5th Cir. 1979) (choosing not to resolve issue concerning the burden of proof that should apply when the party carrying the burden had "met both burdens of proof").

54

misinformation concerning the crew's willingness to answer questions. We will address each contention in turn, mindful of the fact that the Schultz Declaration in this case is prima facie evidence that the vessel at issue was a vessel without nationality, Devila, 216 F.3d at 1015 n.4, given that Officer Schultz was designated by the Secretary of State to make certifications under the MDLEA.

As to the appellants' first contention, we note that 46 U.S.C. app. § 1903(c)(2)(C) is silent about a duty upon the Coast Guard to conduct a follow-up investigation if the claimed nation of registry maintains that it needs more information before it can confirm or deny a claim of registry. See 46 U.S.C. app. § 1903(c)(2)(C). Nevertheless, even assuming that the Coast Guard did have a duty to investigate further once the Colombian Navy stated that it needed more information, it would not affect the outcome here because there is no evidence to suggest that such an investigation would be anything but an exercise in futility. First, we note that the RHI boarding team already had performed a complete, thorough search of the vessel at the time the Colombian Navy was contacted, but the team had been unable to find any identifying marks on the vessel or any registration documents on board. There is no indication in the record that a second search that covered the same ground would have been any different. Second, we note that RHI Boarding Officers Burke and Harrington both questioned the vessel

55

crew members about the nationality of the vessel and crew before the Colombian Navy was contacted, but the crew never volunteered the name of the vessel and its registration number. Nor do the defendants claim that the crew members had the registration number or any other specific identifying information committed to memory. It is pure speculation, therefore, to suggest that the Coast Guard would have obtained the name and registration number of the vessel — both of which were needed by the Colombian Navy — had the RHI boarding team gone back and spoken again with the crew. It follows that, even if the Coast Guard was required to conduct a follow-up investigation, there is no evidence in the record that such an investigation would have changed the outcome here.

As to the appellants' second contention, even if the Coast Guard statement to the Colombian Navy was inaccurate in stating that the crew had refused to provide additional information, there is no indication that, had the Coast Guard correctly told the Colombian Navy that the crew members had not volunteered the vessel's name and registration number, it would have changed the result here. Indeed, as we have explained, nowhere in the record is there any suggestion that another search of the vessel or another round of interrogating the crew would have turned up both the vessel's name and registration number. Thus, the second contention of the appellants must fail, as this is not a case where there is evidence that, had the

Coast Guard not provided inaccurate information, the claimed nation of registry would have confirmed the claim of registry.

In conclusion, we reject the appellants' contention that the government failed to come forward with evidence sufficient to demonstrate that the statutory requirement for subject matter jurisdiction imposed by 46 U.S.C. app. § 1903 was met in this case. As we have shown, the factual scenario that played out in this case falls squarely within the contours of § 1903(c)(2)(C) in that Tinoco, the master in charge, claimed that the vessel was of Columbian registry, and Columbia, the claimed nation of registry, stated that it could not confirm or deny the claim, and thus did not affirmatively and unequivocally assert that the vessel was of Colombian nationality. 46 U.S.C. app. § 1903(c)(2)(C). Furthermore, the contentions of the appellants fail in this case because, even if the Coast Guard had investigated further and had provided more accurate information to the Colombian Navy, there is no evidence in the record that it would have led to a different result. Thus, the district court was correct to conclude that the vessel at issue, being a vessel without nationality under § 1903(c)(2)(C), constituted a vessel subject to the jurisdiction of the United States under § 1903(c)(1)(A).

D.    The District Court's Decision Not to Suppress the Cocaine Seized by the Coast Guard

In this subsection, we address whether evidence concerning the cocaine

57

seized by the Coast Guard should have been suppressed at trial under the Fourth Amendment. Prior to trial, the defendants filed a motion to suppress the government's evidence concerning the bales of cocaine retrieved from the ocean — bales that had been thrown overboard during the pursuit of the defendants' vessel by the RHI — based on the argument that the cocaine was the fruit of the Coast Guard's illegal stopping and boarding of the vessel. The district court denied the defendants' motion, and Hernandez and Estupinan now challenge the district court's conclusions. In reviewing their challenge, we note that we apply a mixed standard of review to the district court's denial of the suppression motion, reviewing the court's findings of fact for clear error and its application of the law to those facts de novo. United States v. Gil, 204 F.3d 1347, 1350 (11th Cir.) (per curiam), cert. denied, 531 U.S. 951, 121 S. Ct. 357 (2000).

We conclude that the district court did not err in ruling that the Coast Guard acted consistently with the Fourth Amendment when it stopped and boarded the vessel in this case. Under the Fourth Amendment, the Coast Guard may stop and board a foreign vessel in international waters if it has a reasonable suspicion that the vessel is engaged in activity that violates United States law. United States v. Reeh, 780 F.2d 1541, 1544 (11th Cir. 1986). "To determine whether reasonable suspicion exists, the court must look at the totality of the circumstances of each

case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Hunter, 291 F.3d 1302, 1306 (11th Cir. 2002) (internal quotation marks omitted). Though there must be an objective basis for suspecting wrongdoing, officers subjectively may assess the facts in light of their unique training, expertise, and experience in the field. United States v. Roy, 869 F.2d 1427, 1430 (11th Cir. 1989). Reasonable suspicion exists, moreover, if the cumulative information of which the detaining officer is aware suggests criminal activity, even if each fact, viewed in isolation, can be given an innocent explanation. United States v. Arvizu, 534 U.S. 266, __, 122 S. Ct. 744, 750-53 (2002).

In light of these Fourth Amendment principles, it is clear that the Coast Guard had reasonable suspicion to believe that the vessel here was engaged in illegal smuggling activities in violation of the MDLEA, and thus had grounds to stop and board the vessel. The defendant's vessel was unmarked, flagless, and bore no other identifying marks. Its design fit the profile of a smuggling vessel. The vessel's crew, moreover, did not respond when Coast Guard members attempted to hail the vessel by radio, and the vessel attempted to flee when the RHI was launched from the Thetis cutter. In addition, the Coast Guard observed the vessel crew members throwing bales and fuel drums into the water in the path of

the RHI. These facts, when viewed cumulatively, support the district court's finding that the Coast Guard had reasonable suspicion under the Fourth Amendment to stop and board the vessel.

Alternatively, even if reasonable suspicion had not been present, Hernandez and Estupinan's challenge to the suppression motion still would fail. This is because the cocaine was seized by the Coast Guard after it was thrown into the ocean by the vessel crew members. The crew members, including Hernandez and Estupinan, effectively abandoned the contraband and thus have no Fourth Amendment standing to challenge the seizure. See California v. Hodari, 499 U.S. 621, 629, 111 S. Ct. 1547, 1552 (1991) (holding that officers may seize any contraband that a fleeing suspect discards during flight because the suspect has abandoned the contraband); United States v. Edwards, 644 F.2d 1, 2 (5th Cir. Unit B May 1981) (per curiam) (stating that if defendant has abandoned property — meaning that he has "voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question" — he has no reasonable expectation of privacy in the property, and thus no right to object to a search thereof) (citation omitted). Accordingly, we affirm the district court's denial of the suppression motion.

E.    The District Court's Evidentiary Rulings

In this subsection, we address whether the district court committed reversible error by making what the appellants contend were a series of erroneous evidentiary rulings. We will analyze each of the following evidentiary issues in turn: (1) the district court's admission of the testimony of Officer Bradley and Agent Rivera as lay opinion testimony, (2) the district court's decision to allow government witnesses to use the phrase "go-fast" to describe the vessel involved in this case, and (3) the district court's admission of testimony that addressed the market value of the seized cocaine in the United States.

1. The District Court's Admission of the Testimony of Officer Bradley and Agent Rivera as Lay Opinion Testimony

At trial, the four defendants objected to the government's introduction of the testimony of Randy Bradley, a law enforcement officer aboard the Thetis cutter, and of Adalberto Rivera, an FBI drug agent, since the government had not provided any notice that it planned to call these witnesses as experts and had not provided summaries of their testimony prior to trial, as required by Federal Rule of Criminal Procedure 16(a)(1)(E).[26] The district court overruled the objections and

---

[26]Rule 16 states in part:
> At the defendant's request, the government shall disclose to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided under this subdivision shall describe the witnesses' opinions, the bases and the reasons for those opinions, and the witnesses' qualifications.

61

ruled that the testimony of the two witnesses was admissible as lay opinion testimony.  As a result, Officer Bradley was able to testify that the vessel in this case fit the profile of a "go-fast" boat, a type of boat that can travel at high rates of speed and thus is considered a favored vehicle for drug smuggling operations.  He also opined that vessels like the one used by the defendants have particular concealment capabilities as far as air and sea detection.  Officer Bradley further explained that the presence of the defendants' vessel hundreds of miles out in the ocean was particularly suspicious, given that, when used for recreational purposes, such vessels carry enough fuel to travel safely only within 20 nautical miles of the shore.  In addition to the Officer Bradley's testimony, the district court permitted Agent Rivera to testify about the market value in the United States of the amount of seized cocaine in this case.  He gave his opinion that, at the time the trial occurred,  the 1,807 kilograms of cocaine seized in this case had a market value that ranged from $12,000 to $29,000 per kilogram.

On appeal, Hernandez and Estupinan argue that the district court erred in admitting the testimony of Officer Bradley and of Agent Rivera as lay opinion testimony under the version of Federal Rule of Evidence 701 in effect at the time

Fed. R. Crim. P. 16(a)(1)(E) (2000).

of their trial,[27] rather than as expert testimony under Rule 702.[28]  Because the

testimony constituted expert testimony, the appellants maintain, the government

was bound by the disclosure requirements for expert testimony contained in

Federal Rule of Criminal Procedure 16(a)(1)(E), which the government

disregarded.  The appellants assert that the government's failure to comply with

these disclosure requirements with respect to Officer Bradley was prejudicial, since

it precluded them from having time to find and produce a witness or photographs

to refute Bradley's claims about the usage in and around Colombia of vessels like

the one in this case.  The appellants further argue that the prejudice produced by

the unanticipated testimony of Officer Bradley was compounded by the

---

[27]The version of Rule 701 in effect at the time of the trial states:
> If the witness is not testifying as an expert, the witness' testimony
> in the form of opinions or inferences is limited to those opinions or
> inferences which are (a) rationally based on the perception of the
> witness, and (b) helpful to a clear understanding of the witness'
> testimony or the determination of a fact in issue.

Fed. R. Evid. 701 (2000).  Rule 701 was amended in late 2000 to add a subpart (c), which circumscribes the admission of lay opinion testimony to testimony that is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701 (2001); see also Fed. R. Evid. 701, advisory committee's notes, 2000 Amendments. The amendment is not applicable here, however, because the effective date was 1 December 2000, after the trial in this case.  See Fed. R. Evid. 701 (2001).

[28]Rule 702 states:
> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise.

Fed. R. Evid. 702 (2000).

unanticipated testimony of Agent Rivera, whose testimony concerning the market value of the cocaine, they maintain, should have been excluded as irrelevant under Federal Rule of Evidence 402[29] or as unfairly prejudicial under Rule 403.[30]

We review the evidentiary rulings of the district court for a clear abuse of discretion. United States v. Novaton, 271 F.3d 968, 1005 (11th Cir. 2001), cert. denied, __ U.S. __, 122 S. Ct. 2345 (2002). Furthermore, we will reverse only if the resulting error "affected the defendant's substantial rights." United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999) (citation omitted). Indeed, the defendant must show "actual prejudice" — "that the failure to disclose the existence of [the] expert adversely affected [the defendant's] ability to present a defense" — before reversal is warranted for the government's failure to comply

---

[29]Rule 402 states:
> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

Fed. R. Evid. 402 (2000); see also Fed. R. Evid. 401 (2000) (defining "relevant evidence").

[30]Rule 403 states:
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403 (2000).

with Federal Rule of Civil Procedure 16(a)(1)(E). <u>United States v. Chastain</u>, 198 F.3d 1338, 1348 (11th Cir. 1999).

We turn first to the testimony of Officer Bradley concerning the vessel in this case and its characterization as a "go-fast" boat. We conclude that Officer Bradley's testimony fell within the purview of lay opinion testimony under Federal Rule of Evidence 701, and thus was not subject to the disclosure requirements found in Federal Rule of Civil Procedure 16(a)(1)(E). In <u>Novaton</u>, we held that lay opinion testimony and expert testimony are not always mutually exclusive under the Federal Rules of Evidence, at least in cases like the present one where the pre-amendment version of Rule 701 applies.[31] 271 F.3d at 1007-09. In that drug-related case, we held that the district court did not err in admitting as lay witnesses several law enforcement agents who testified about the meaning of code words used in taped conversations, just because the agents' testimony happened to be based in part on their prior experiences in the line of duty. <u>Id.</u> The testimony of Officer Bradley about the vessel in this case, and its characterization as a "go-fast" boat, was based in part on his personal observation of the vessel while he was on the Thetis cutter, and in part on his past experiences in the line of duty. His testimony, therefore, was substantially the same as the testimony of the agents in

---

[31]<u>See</u> <u>supra</u> note 27; <u>see</u> <u>also</u> <u>Novaton</u>, 271 F.3d at 1009 n.9.

65

Novaton.  It follows that the district court did not err in admitting his testimony as lay opinion testimony under Federal Rule of Evidence 701, even if the testimony also could have been admitted as expert testimony under Rule 702.

We turn to the testimony of Agent Rivera concerning the market value of the cocaine that was seized.  Agent Rivera's testimony regarding how much a kilogram of cocaine was worth in the United States at the time of the seizure in this case was wholly based on his past experience as a drug squad member.  In this regard, his testimony was generalized in nature and did not depend on personal observations about any particular factual circumstances unique to this case.  Arguably, Agent Rivera's generalized testimony is different from that of the agents in Novaton, whose testimony was based in part on their past experience, but also was based in part on what they had learned through personal observation while participating in the drug investigation.

Nevertheless, we need not resolve whether Agent Rivera's testimony diverges too far from what was permitted as lay opinion testimony in Novaton.  Even if the district court erred in permitting Agent Rivera to testify as a lay witness, and even if Agent Rivera's testimony was subject to the disclosure requirements of Federal Rule of Criminal Procedure 16(a)(1)(E), Hernandez and Estupinan have failed to show actual prejudice, as required by cases such as

66

<u>Chastain</u>, 198 F.3d at 1348. That is, the appellants have not demonstrated how the government's failure to identify Agent Rivera and provide a summary of his testimony under Rule 16(a)(1)(E) before trial actually affected their ability to present a defense. Rather, the appellants' position is that Agent Rivera's testimony should have been excluded as irrelevant under Federal Rule of Evidence 401 or as unfairly prejudicial under Rule 403, a separate inquiry from whether the failure to disclose the testimony affected their ability to present a defense at trial. Since they have not shown actual prejudice, the appellants fail in their claim with respect to Agent Rivera.

2.      The District Court's Decision to Allow Government Witnesses to Use the Phrase "Go-Fast" to Describe the Vessel Involved in This Case

The four defendants also filed a motion <u>in</u> <u>limine</u>, which the district court denied, in which they objected to the use of the phrase "go-fast" by Officer Bradley and other law enforcement witnesses in their descriptions of the vessel in this case. On appeal, Hernandez and Estupinan argue that the district court erred by permitting government witnesses to use the phrase at trial. The appellants maintain that, because the phrase was nothing more than workplace vernacular used by members of the Coast Guard, the phrase should have been excluded from testimony as irrelevant under Federal Rule of Evidence 402. They also contend that the use of the phrase should have been prevented at trial because the phrase

creates a sinister connotation that warrants its exclusion as unfairly prejudicial under Rule 403.

We begin our analysis by noting that Federal Rule of Evidence 402 provides that all relevant evidence is admissible. See Fed. R. Evid. 402. The standard for what constitutes relevant evidence is a low one: evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Furthermore, "[d]eterminations as to the relevancy of evidence are well within the broad discretion of the district courts and will not be disturbed on appeal absent a showing that the trial court abused its discretion." United States v. Russo, 717 F.2d 545, 551 (11th Cir. 1983) (per curiam).

Federal Rule of Evidence 403, in turn, permits the district court to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. "Rule 403 is an extraordinary remedy which the district court should invoke sparingly," and "[t]he balance . . . should be struck in favor of admissibility." United States v. Elkins, 885 F.2d 775, 784 (11th Cir. 1989). In reviewing issues under Rule 403, we "look at the evidence in a light most favorable to its admission, maximizing its probative value

and minimizing its undue prejudicial impact." Id. We review the district court's Rule 403 determinations, moreover, for a clear abuse of discretion. Id.

In the present case, government witnesses testified that the term "go-fast" was used by the Coast Guard to describe a type of vessel commonly used in smuggling operations. While reference to the vessel in this case as a "go-fast" vessel may have been somewhat prejudicial, we cannot say that it was unfairly so, a prerequisite to the exclusion of prejudicial testimony under Rule 403. See Fed. R. Evid. 403. This is because the phrase was used in the context of testimony that was meant to show the "significance of certain conduct or methods of operation unique to the drug distribution business," testimony that "experienced narcotics agent[s]" are permitted to provide. United States v. Butler, 102 F.3d 1191, 1199 (11th Cir. 1997) (allowing testimony that money seized was packaged in "dealer folds," a manner of packaging peculiar to drug dealers). The use of the term, furthermore, was relevant because it pointed to the appellants' knowing participation in the drug conspiracy. See United States v. Cruz-Valdez, 773 F.2d 1541, 1547 (11th Cir. 1985) (en banc) (noting that fact that vessel was unfit for other use was probative in proving crew member's knowing participation in drug smuggling conspiracy). Consequently, we reject the appellants' argument and conclude that the district court did not abuse its discretion in allowing the

testimony, especially since we are compelled to strike the balance in favor of admissibility. See Elkins, 885 F.2d at 784.

3. The District Court's Admission of Testimony that Addressed the Market Value of the Seized Cocaine in the United States

The four defendants objected at trial to the introduction of Agent Rivera's testimony concerning the market value in the United States of the seized cocaine, contending that the evidence concerning market value should be excluded as irrelevant under Federal Rule of Evidence 402 or as unfairly prejudicial under Rule 403. The district court decided to permit the testimony, and Hernandez and Estupinan now appeal that decision.

As explained in the previous subsection, we review for an abuse of discretion. See Russo, 717 F.2d at 551 (applying abuse of discretion standard in reviewing district court rulings under Rule 401); Elkins, 885 F.2d at 784 (applying abuse of discretion standard in reviewing district court rulings under Rule 403). We conclude that Rivera's testimony was relevant as proof of the appellants' knowing participation in the drug conspiracy. See Cruz-Valdez, 773 F.2d at 1546 (noting that "it is highly improbable that drug smugglers would allow an outsider on board a vessel filled with millions of dollars worth of contraband"). The value of the cocaine also was relevant to showing that the cocaine most likely was not for personal consumption, but for large-scale distribution, which went to whether the

appellants acted with an intent to distribute the cocaine, as charged in the superceding indictment. See United States v. Sarmiento, 744 F.2d 755, 761 (11th Cir. 1984) ("Intent to distribute may be inferred from the amount of cocaine involved."). Moreover, given that Agent Rivera's testimony was relevant to the proceedings under Rule 702, and given that we are to view the testimony in the light most favorable to its admission, Elkins, 885 F.2d at 784, we cannot say that the potential danger of unfair prejudice substantially outweighed the probative value of Agent Rivera's testimony. Accordingly, we reject the appellants' argument and rule that the district court acted within its discretion in admitting the testimony.[32]

F.    The Sufficiency of the Evidence with Respect to the Appellants' Convictions

At trial, after the government had rested its case, the defendants each moved under Federal Rule of Criminal Procedure 29[33] for judgment of acquittal on the two

---

[32]The appellants also contend that, when taken together, the cumulative effect of the district court's evidentiary rulings caused reversible error. In the three subparts of Part II.E, we have demonstrated that the district court did not make a series of cumulative evidentiary errors. By virtue of our conclusions in Part II.E, the appellants' cumulative effect argument necessarily fails.

[33]Rule 29 states in part:
a) Motion Before Submission to Jury. Motions for directed verdict are abolished and motions for judgment of acquittal shall

MDLEA counts, conspiracy to possess with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States, and possession with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States. The district court denied the motions. At the close of evidence, the defendants renewed their motions, but the district court denied these motions as well. Hernandez and Estupinan now argue on appeal that their respective convictions should be overturned on both counts because the evidence presented at trial was insufficient to convict them. The appellants maintain that the evidence at best only demonstrates their mere presence on the vessel, but not their knowing participation

---

be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the government is not granted, the defendant may offer evidence without having reserved the right.

. . . .

c) Motion After Discharge of Jury. If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7-day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned the court may enter judgment of acquittal. It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury.

Fed. R. Crim. P. 29(a), (c) (2000).

in the drug smuggling operation. Additionally, since the cocaine bales were disguised with several layers of wrapping and had no odor, the appellants assert that there was no evidence that they knew the bales contained cocaine.

Under Federal Rule of Criminal Procedure 29, a court may set aside a guilty verdict and enter a judgment of acquittal if there is insufficient evidence to sustain the conviction. Fed. R. Crim. P. 29(a), (c). We review de novo the legal question of whether the record contains sufficient evidence to support the guilty verdict. United States v. To, 144 F.3d 737, 743 (11th Cir. 1998). "When conducting the review of the record, we view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict." Id. (internal quotation marks omitted). We uphold the jury's verdict "unless no trier of fact could have found guilt beyond a reasonable doubt." United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997) (citation omitted). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." Id. (citation omitted).

We commence our review by pointing out that, to prove that a conspiracy exists, the government must establish "that an agreement existed between two or

73

more persons and that the defendant knowingly and voluntarily participated in it." United States v. Garate-Vergara, 942 F.2d 1543, 1547 (11th Cir. 1991). The government can meet its burden through the use of circumstantial evidence. Id. Furthermore, "[a] defendant's presence, although not determinative, is a material factor when weighing evidence of conspiracy." Id. A defendant's presence becomes more significant when the value of the contraband is high, as "it is highly improbable that drug smugglers would allow an outsider on board a vessel filled with millions of dollars worth of contraband." Cruz-Valdez, 773 F.2d at 1546.

The government also can prove possession of a controlled substance with intent to distribute through the use of circumstantial evidence. United States v. Battle, 892 F.2d 992, 999 (11th Cir. 1990) (per curiam). "Possession may be either actual or constructive; if the accused exercised some measure of dominion or control over the contraband, either exclusively or in association with others, he constructively possessed it." Id. (internal quotations marks and citation omitted). A defendant's intent to distribute, moreover, may be inferred from the large quantity of narcotics that were seized. United States v. Iglesias, 915 F.2d 1524, 1528 (11th Cir. 1990).

In addition, we point out that conspiracy and possession cases involving narcotics-laden vessels present repetitive fact patterns. In such situations, we have

74

held that the following factors should be considered in determining whether a jury could reasonably conclude that a defendant found on the vessel was guilty of the drug conspiracy and possession charges:

> (1) probable length of the voyage, (2) the size of the contraband shipment, (3) the necessarily close relationship between captain and crew, (4) the obviousness of the contraband, and (5) other factors, such as suspicious behavior or diversionary maneuvers before apprehension, attempts to flee, inculpatory statements made after apprehension, witnessed participation of the crew, and the absence of supplies or equipment necessary to the vessel's intended use.

Garate-Vergara, 942 F.2d at 1547. We also have stated that once a large quantity of contraband is shown to have been present on a vessel, the government's remaining burden of showing that the crew knowingly participated in the drug smuggling operation is "relatively light." Cruz-Valdez, 773 F.2d at 1547. Indeed, the government can meet its remaining burden by proving any one of the other previously listed factors. United States v. Ospina, 823 F.2d 429, 433 (11th Cir. 1987) (per curiam).

In the present case, the jury had a reasonable basis for concluding that Hernandez and Estupinan were guilty on the MDLEA conspiracy and possession counts. As explained, since the government demonstrated that there was a large amount of cocaine on the appellants' vessel, the government's remaining burden of showing that the appellants participated in the drug smuggling operation was a

light one.  See Cruz-Valdez, 773 F.2d at 1547 ("[W]e think it reasonable for a jury to conclude that in the course of transporting or distributing millions of dollars worth of readily marketable [contraband], through channels that wholly lack the ordinary protections of organized society, a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders.").  The government met this remaining burden in several ways.

First, the government established that Hernandez and Estupinan were two of only four crew members on a small vessel, approximately 40 feet in length, that was loaded with 1,807 kilograms of cocaine. The presence of a large amount of contraband on a small vessel with a small crew evidenced the defendants' knowing participation in the drug smuggling operation.  See id. at 1546 ("[U]nder most circumstances large quantities of contraband on a small vessel make it most unlikely that the persons on board will be ignorant of its presence.").  Second, the government established that the vessel used by the appellants was not equipped with fishing gear, carried no significant cargo other than the bales of cocaine and fuel drums, and was too far out at sea to be sailing for recreational purposes, given the vessel's small size and limited fuel capacity.  The lack of any legitimate commercial or recreational purpose for the vessel's voyage further indicated the appellants' knowing participation.   See id. at 1547; United States v. Ceballos, 706

F.2d 1198, 1202 (11th Cir. 1983).  Finally, the government proved that, before the appellants' vessel was stopped and detained, the vessel crew engaged in evasive maneuvers, which included throwing bales of cocaine and fuel drums into the path of the Coast Guard vessel that was pursuing them.  The evasive maneuvering of the vessel during the course of a high speed chase by the Coast Guard provides additional evidence of the appellants' culpability.  See United States v. Fuentes, 877 F.2d 895, 900 (11th Cir. 1989); Cruz-Valdez, 773 F.2d at 1547.

From this evidence presented by the government, it was reasonable for the jury to conclude that Hernandez and Estupinan agreed to enter into the drug smuggling conspiracy and that they knowingly and voluntarily participated in it.  The evidence also supported the jury's conclusion that the conspiracy was for the purpose of distributing the cocaine.  See Iglesias, 915 F.2d at 1528 (holding that large quantity of drugs involved created inference that defendants acted with intent to distribute the drugs).  Finally, the circumstances that were sufficient to support the appellants' conspiracy conviction also support their conviction on the possession count.  See Battle, 892 F.2d at 999; Cruz-Valdez, 773 F.2d at 1544.  Hence, we reject the appellants' challenge to their convictions on sufficiency-of-the-evidence grounds.

## III.  CONCLUSION

In this appeal, we have addressed several challenges that Defendants-Appellants Manuel Hernandez and Tito Daniel Estupinan have made upon their convictions under the MDLEA for conspiracy to possess with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States, and for possession with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States. In addressing these challenges, we have come to the conclusion that the appellants' convictions should be affirmed because none of their arguments for reversal are ultimately persuasive.

In the course of this opinion, we have rejected the appellants' argument that 46 U.S.C. app. § 1903 is facially unconstitutional because its penalty provision, § 1903(g) — a provision that incorporates the penalties framework set forth in 21 U.S.C. § 960 — violates the dictates of the Supreme Court's <u>Apprendi</u> decision. Applying the logic of our <u>Sanchez</u> decision, we have decided that because 21 U.S.C. § 960 has a catchall penalty provision that provides a sentencing range without regard to drug quantity, § 960(b)(3), there is no <u>Apprendi</u> constitutional error if the sentencing judge's drug quantity finding caused the defendant to be sentenced below the statutory maximum found in § 960(b)(3). We further have determined that there is constitutional error under <u>Apprendi</u> in the 21 U.S.C. § 960

context only when the judge's factual finding actually increased the defendant's sentence above the statutory maximum found in § 960(b)(3), and only when the fact that led to the enhanced sentence was not charged in the federal indictment or submitted to the jury for proof beyond a reasonable doubt. Our reasoning thus has led us to the conclusion that § 960 is not facially unconstitutional, and that, by extension, neither is 46 U.S.C. app. § 1903. In fact, we have pointed out that the appellants' own sentences are examples of situations where there is no Apprendi error in the § 1903 context.

We also have rejected the appellants' assertion that the jurisdiction and venue provision of the MDLEA, 46 U.S.C. app. § 1903(f) — a provision that requires that the issue of whether a vessel is subject to the jurisdiction of the United States be decided by the trial judge as a preliminary issue of law, rather than be submitted to the jury for proof beyond a reasonable doubt — violates the principles enunciated in the Supreme Court's Gaudin decision. We reached this result because, since the time of our Medina decision, Congress has amended § 1903(f) in a manner that plainly shows that the question of whether a vessel is subject to the jurisdiction of the United States is not an element of the substantive MDLEA offense, but instead is solely a question of subject matter jurisdiction that should be treated as a preliminary question of law for the court's determination.

79

Furthermore, we have ruled that Congress has the flexibility under the Constitution to label the MDLEA jurisdictional requirement as a non-element of the offense, given that the requirement is not a traditional offense element under the common law or otherwise an essential ingredient of the offense, as our Gonzalez decision and the Supreme Court's Ford decision demonstrate.

Finally, we have rejected the appellants's non-constitutional challenges to their convictions. We have ruled that the district court did not err by concluding that the government met its evidentiary burden of showing that the vessel at issue was subject to the jurisdiction of the United States under the MDLEA, by denying the appellants' motion in limine to suppress the cocaine seized by the Coast Guard, or by admitting the testimony of Officer Bradley as lay opinion testimony. We also have decided that the district court's admission of Agent Rivera's testimony as lay opinion testimony, even if improper, did not result in actual prejudice to the appellants. We have determined, furthermore, that the district court correctly permitted government witnesses to use the phrase "go-fast" to describe the vessel in this case, correctly allowed testimony concerning the market value of the seized cocaine, and correctly denied the appellants' motion for judgment of acquittal on the two MDLEA counts.

Accordingly, for all of the reasons stated, we AFFIRM the convictions of

Hernandez and Estupinan.