**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 23-12459

————————————————

MIGUEL JACKSON,
ALEXIAS E. STEVERSON,

*Plaintiffs-Appellants,*

KELVIN STEVENSON, et al.,

*Plaintiffs,*

*versus*

JOSEPH CATANZARITI,
JOSHUA EASON,
DERIUS ATTICAL,
SHELDON DELOACH,
JARROD BENNETT, et al.,

*Defendants-Appellees,*

ANDREW MCFARLANE, et al.,

*Defendants.*

———————————————

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 6:12-cv-00113-JRH-BWC

———————————————

Before JILL PRYOR, GRANT, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

This civil rights excessive force case arose out of a prison riot that occurred on December 31, 2010 at Smith State Prison in Glennville, Georgia. The Plaintiffs, Miguel Jackson and Kelvin Stevenson, were inmates when their prison dormitory was placed on lockdown because an inmate was seen breaking an outside fence and bringing objects into the prison. In the course of a search, Correctional Officer Joseph Catanzariti discovered marijuana and contraband cellphones in Jackson's cell. According to the officers' account, inmates Jackson and Stevenson began assaulting prison guards; both were eventually handcuffed and escorted away. Thereafter, these inmates alleged that they were badly beaten by Catanzariti and many other correctional officers.

Jackson and Stevenson commenced this lawsuit in the United States District Court for the Southern District of Georgia, asserting Eighth Amendment excessive force and failure to intervene claims against thirty-nine correctional officers. By the time the trial began on June 12, 2023, some eleven years after the case had been filed, only nine defendants -- including Correctional Officers Catanzariti and Caleb Harrison -- were left. Notably, just before jury selection, Plaintiffs' counsel moved the court to

voluntarily dismiss seven of the remaining defendants under Federal Rule of Civil Procedure 41.  Defense counsel protested, arguing that the motion was made at the very last minute and that it seriously prejudiced the defendants.  Thus, counsel asked the district court to enter final judgment in the dismissed defendants' favor, along with the imposition of costs and sanctions against the Plaintiffs' lawyer.  The trial court granted the motion under Rule 41(a)(2) and imposed judgment (but not costs) in favor of seven of the remaining defendants, leaving only Officers Catanzariti and Harrison as the Defendants in the case.  However, the court deferred the question of costs and sanctions for a later time.

During the course of a four-day jury trial, which proceeded against only the two remaining officers, the Plaintiffs objected to the admission of several pieces of evidence and testimony offered by Catanzariti and Harrison, including that marijuana had been found in Jackson's cell, that Jackson took a swing at Officer Catanzariti just outside the inmate's cell, that numerous correctional officers sustained injuries during the riot, that Jackson and Stevenson were members of the same prison gang, and finally, Jackson's history of prior criminal convictions.  The court admitted each of these pieces of evidence.

Ultimately, the jury rejected Plaintiff Jackson's excessive force claim against Officer Catanzariti, but it determined that Catanzariti had failed to intervene when other officers used excessive force.  However, the jury awarded only $1.00 in damages to Jackson.  The jury also determined that Plaintiff Stevenson's excessive

force and failure to intervene claims against Officers Catanzariti and Harrison failed.

Two issues are raised on appeal. First, the Plaintiffs argue that the district court abused its discretion in granting their Rule 41 motion by dismissing seven defendants from the case and imposing final judgment in the defendants' favor. They claim that they had withdrawn their motion for voluntary dismissal after defense counsel raised the specter of costs and sanctions, and that the district court fatally erred in dismissing only some of the defendants from the case, rather than the entire action. Second, the Plaintiffs challenge each of the district court's highlighted evidentiary determinations.

After thorough review and with the benefit of oral argument, we are satisfied that the district court did not abuse its considerable discretion in either way, and accordingly, we affirm the final judgments entered by the trial court.

## I.

### A.

Miguel Jackson and Kelvin Stevenson were inmates at Smith State Prison within the Georgia Department of Corrections. Jackson was serving a fifty-year term for three armed robberies. Stevenson, in turn, was serving a twenty-year sentence for rape. Both men were housed in Dormitory D-2, along with approximately ninety-five other inmates across two floors. Typically, inmates were "not required to be in their cells at all time[s]" and could

23-12459          Opinion of the Court          5

"move about freely."  If the dormitory was placed on "lockdown," however, the inmates were required to remain in their cells.

On December 31, 2010, the prison officials locked down Dormitory D-2 because video cameras showed an inmate breaching a fence outside the dormitory and bringing objects from outside into the dorm.  Correctional officers conducted a "shakedown" of Dormitory D-2 in search of the objects the inmate had smuggled inside.  Officers Joseph Catanzariti and Caleb Harrison, among other correctional officers, searched the dorm's common areas and found nothing.

After the inmates were released from lockdown for their evening meal, the correctional officers began to search each inmate's cell in the dormitory.  When Correctional Officer Catanzariti came to Jackson's cell, he smelled "a strong odor of what appeared to [him] to be marijuana."  In the course of his search, Catanzariti "found what appeared to be [a] green, leafy substance that appeared to be marijuana."  Catanzariti also discovered contraband cellphones after he shone his flashlight into a heater vent inside the cell.  He asked another officer to get hand tools in order to access the vent.  Using a hammer, a screwdriver, and a pair of Channellock pliers, Catanzariti opened the vent and retrieved the cellphones.  Other officers found additional contraband in some of the other cells.

When the inmates returned to their cells from their meal, Lieutenant Andrew McFarlane ordered them back into lockdown. The inmates protested because they had been placed on lockdown

earlier that day.  Just as Catanzariti exited Jackson's cell, he saw the Plaintiffs, Jackson and Stevenson, standing there with other inmates.  Jackson testified that he "playfully swiped" at Officer Catanzariti and asked him "[w]hat you got in your hand?  Give me that."  But, Jackson claimed, he did not touch the officer.  Catanzariti testified, however, that he told Jackson that the items he had found were being confiscated and he asked Jackson to step aside.  He recounted that Jackson "looked over his left shoulder at the other inmates on the tier and said, 'Y'all ready.'"  According to Catanzariti, Jackson then "swung at [his] hand trying to knock the contraband and hammer and channellocks and screwdriver out of [his] hands."  Catanzariti said that he was hit in the front and back of his head by different inmates while he held on to the contraband and tools.

By this time, a riot erupted in Dormitory D-2.  Another testifying officer, Gary Mitchell, asserted that a prison guard had been "jumped on by several inmates" who were "kicking him, punching him, doing all kinds of aggravated assault against this officer."  Mitchell also testified that his "mouth was busted open" by a hard object in a sock.  Multiple witnesses described the situation as "chaotic" (including inmates George Anderson and Michael Briscoe), six correctional officers testified about the riotous nature of the events on December 31, and Lieutenant McFarlane characterized the occurrence as a "a major disturbance" in the dormitory.

Catanzariti further testified that he gave the tools away and attempted to handcuff Stevenson, while the inmate was assaulting

him.  Officer Caleb Harrison assisted Catanzariti in an attempt to subdue Stevenson.  Officer Harrison secured one of Stevenson's arms, but Stevenson continued to resist, so Catanzariti, after having repeatedly ordered Stevenson to stop resisting, delivered what he said were approximately three strikes (known as a "brachial stun") to Stevenson's shoulder, in order to secure Stevenson's second arm in handcuffs.  Catanzariti explained that he "didn't know if [Stevenson] had a weapon on him" because "during the shakedown officers had found homemade weapons" elsewhere in the dorm.  Stevenson claimed, however, that after he was handcuffed and compliant, Officer Catanzariti hit him in the face with the blunt end of a hammer some "10 to 15 times."  Stevenson added that the strikes broke his right eye socket and right jaw, severed the nerves in his face, and "busted" holes in his head and chin.  Catanzariti flatly denied Stevenson's account, explaining that he did not have the hammer in his possession when he secured Stevenson and escorted him away.

Catanzariti and several other correctional officers placed Jackson against the wall and handcuffed him as well.  Jackson testified that after being handcuffed, Catanzariti hit him in the nose with a flashlight.  Catanzariti denied this too.  Jackson also claimed that once he was escorted away from his cell, the correctional officers smashed his face against a door, threw him on a fence, jumped on him, and kicked and punched him.  He further testified that Officer Catanzariti kicked and punched him on the way to the medical ward.  He said that Catanzariti and another officer beat him "with a Blackjack" and "with a cold, steel object" (likely a

flashlight), all while he was still handcuffed. Catanzariti denied these accusations as well in the course of his testimony.

Jackson was subsequently sent to Evans Memorial Hospital, where he spoke to several physicians and nurses. He said: "I showed them that my teeth had been knocked out of my mouth. I told them that it felt like my nose was broken. I had cuts all over my face. I told them that I blacked out a couple of times." He testified that he received "20-something" stitches on his face. Medical records indicate that Jackson had sustained many lacerations on his face, nasal damage, and dental injury when he arrived at the hospital. After a CT examination, Jackson was found to have sustained "facial and bilateral scalp swelling," a "nasal bone and nasal septal fracture," and "a fracture of the tooth socket." He also received sutures on his forehead, nose, and lips.

**B.**

On December 10, 2012, the Plaintiffs, Jackson and Stevenson, commenced this lawsuit in the Southern District of Georgia against thirty-nine correctional officers (including Catanzariti and Harrison), pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments, alleging excessive force and failure to intervene. The Plaintiffs also sued Correctional Officers Catanzariti, McFarlane, and Joshua Eason for supervisory liability. The defendants moved the court to stay all proceedings under *Younger v. Harris*, 401 U.S. 37 (1971), since criminal charges were pending against Jackson and Stevenson for their roles in the riot. The case was stayed for about three years.

In January 2018, the Plaintiffs voluntarily dismissed with prejudice their claims against fifteen of the thirty-nine defendants. Thereafter, the district court granted the defendants' motions for summary judgment in part, rejecting the supervisory liability claims and dismissing five additional defendants from the case. The Plaintiffs then voluntarily dismissed their claims against ten more defendants, leaving only nine defendants remaining in the case: Derius Attical, Jarrod Bennett, Joseph Catanzariti, Michael Deloach, Sheldon Deloach, Joshua Eason, Caleb Harrison, Gordon Pittman, and Timothy Simmons.

After the completion of discovery in late 2017, the court had to reschedule its pretrial conference on three separate occasions at the Plaintiffs' request. Finally, in June 2023, the trial began. However, before the jury was selected on the first day, the Plaintiffs orally moved to dismiss seven more defendants from the case: Attical, Bennett, Michael Deloach, Sheldon Deloach, Eason, Pittman, and Simmons -- leaving only Officers Catanzariti and Harrison as Defendants. Plaintiffs' counsel explained: "[W]e increase our chances of winning if [we] just go with Catanzariti and we just go with Caleb Harrison." Counsel told the court that "[t]his is not gamesmanship" and that the motion was made to "streamline" the proceedings and make for "an easier, smoother, more efficient trial."

Defense counsel was "personally infuriated" by the request: "I prepped for this trial for three times," she said. "I have been ready for three times. I have driven here. Actually, I booked an

Airbnb. I can't get the money back for the state. The state -- what's not recoverable is Georgia's taxpayers have paid for myself and for co-counsel to be at everything all the time." She continued: "This is a demonstration of absolute contempt for this court's processes, for the Pretrial Order process, and for what this system is about. I would ask that all claims be dismissed for this contempt of the court's process." Since the motion had been made so late in the course of these lengthy proceedings, counsel asked the court to enter final judgment in favor of each of the dismissed defendants. She also urged the court to impose costs and sanctions against Plaintiffs' counsel.

Again, the district court asked the Plaintiffs whether they wished to drop all of the claims against the seven defendants. Plaintiffs' counsel replied: "Exactly. So what I am saying is in the best interest of my client I think it's more advantageous when I look at everything to pursue Catanzariti and to pursue Caleb Harrison." The district judge ruled: "Those seven Defendants are out. I am just trying to decide what does it look like." The judge then took a five-minute break to consider what conditions, if any, he might impose along with the dismissals.

Upon return, the district court construed the Plaintiffs' oral motion to dismiss seven of the defendants as a motion to dismiss under Federal Rule of Civil Procedure 41. *See* Fed. R. Civ. P. 41(a)(2). Plaintiffs' counsel interrupted: "I would like to say for the court *if* you're going to make us pay costs . . . I would rather withdraw the motion and just go forward because this is crazy to me."

23-12459                Opinion of the Court                11

The court granted the Plaintiffs' "eleventh-hour request" and ruled this way: "Based upon these findings then the Court considers that it is proper to grant judgment in favor of Defendants Joshua Eason, Derius Attical, Sheldon Deloach, Jarrod Bennett, Gordon Pittman, Michael Deloach and Timonthy Simmons.  The Defendants' request for additional sanctions will be deferred to allow the parties to file any appropriate motions and brief on that matter."

During the course of the trial, the jury was shown various video recordings of the relevant events that had occurred in the prison on December 31, 2010, and heard testimony from several witnesses including correctional officers, the Plaintiffs, and other inmates.  The Defendants also offered evidence concerning Jackson's criminal history -- his prior convictions and sentences for armed robbery and aggravated assault.[1]  The district court allowed defense counsel on cross examination to impeach Jackson with these prior crimes pursuant to Federal Rule of Evidence 609.  The court also received in evidence, again over the Plaintiffs' objections, the testimony of another inmate George Anderson who said in a deposition that Plaintiffs Jackson and Stevenson were "two ranking individuals" in a prison gang known as the Gangster Disciples.  Finally, the court admitted into evidence, over Jackson's objections, Officer Catanzariti's testimony that he found marijuana in Jackson's cell during the dormitory inspection on December 31, and

---

[1] During Stevenson's cross examination, defense counsel entered into evidence his convictions for rape and obstruction.  Stevenson's counsel did not interpose an objection.

12                    Opinion of the Court                    23-12459

Catanzariti's account that Jackson started the fight by first swiping at Officer Catanzariti's hand.

The jury ultimately determined that Jackson failed to establish by a preponderance of the evidence that Officer Catanzariti used excessive force against him, but awarded Plaintiff Jackson $1.00 in damages after determining that Catanzariti failed to intervene when other officers used excessive force. The jury also found that Plaintiff Stevenson's excessive force and failure to intervene claims against both Officers Catanzariti and Harrison failed.

The Plaintiffs timely appealed the district court's final judgments to this Court. The district court, however, reserved ruling on any motion for sanctions until fourteen days after a mandate issues from this Court.

## II.

## A.

We review a district court's dismissal of a case under Rule 41(a)(2) for an abuse of discretion. *See McCants v. Ford Motor Co.*, 781 F.2d 855, 857 (11th Cir. 1986) ("Dismissal on motion of the plaintiff pursuant to Rule 41(a)(2) is within the sound discretion of the district court, and its order may be reviewed only for an abuse of discretion." (citations omitted)); *see also United States v. $70,600 in U.S. Currency*, 929 F.3d 1293, 1300 (11th Cir. 2019) (same). Ultimately, a "district court enjoys broad discretion in determining whether to allow a voluntary dismissal under Rule 41(a)(2)." *Goodwin v. Reynolds*, 757 F.3d 1216, 1219 (11th Cir. 2014) (quoting

*Pontenberg v. Bos. Sci. Corp.*, 252 F.3d 1253, 1255 (11th Cir. 2001) (per curiam)).

We also review a district court's evidentiary rulings for an abuse of discretion. *See United States v. Estrada*, 969 F.3d 1245, 1270 (11th Cir. 2020) (citing *United States v. Barsoum*, 763 F.3d 1321, 1338 (11th Cir. 2014)).

**B.**

First, the Plaintiffs claim that the district court abused its discretion in granting their Rule 41 voluntary motion to dismiss and in entering final judgment in favor of seven defendants at the outset of the trial. They argue that while they orally made the dismissal motion before jury selection, they withdrew their motion when defense counsel urged the district court also to impose costs and sanctions. The Plaintiffs further assert that Rule 41(a)(2) requires the dismissal of "an action," meaning the dismissal of an entire case, so the trial court erred in dismissing only seven of the nine defendants. We remain unpersuaded by each argument.

For starters, Rule 41(a)(2) permits a district court to impose judgment and assess costs, fees, and such other terms as may be appropriate. Where, as here, a defendant has filed an answer or moved for summary judgment, the plaintiff may voluntarily dismiss his cause of action only by court order. Federal Rule of Civil Procedure 41(a)(2) reads this way: "[A]n action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). We have previously observed that "[t]he purpose of Rule 41(a)(2) 'is primarily to prevent

voluntary dismissals which unfairly affect the other side, and to permit the imposition of curative conditions.'" *Arias v. Cameron*, 776 F.3d 1262, 1268 (11th Cir. 2015) (quoting *McCants*, 781 F.2d at 856). "When granting a voluntary dismissal, 'the district court must exercise its broad equitable discretion under Rule 41(a)(2) to weigh the relevant equities and do justice between the parties in each case, imposing such costs and attaching such conditions to the dismissal as are deemed appropriate.'" *Emergency Recovery, Inc. v. Hufnagle*, 77 F.4th 1317, 1329 (11th Cir. 2023) (quoting *McCants*, 781 F.2d at 857).

The district court did not abuse its considerable discretion in entering judgment in favor of the seven defendants as a condition of dismissal under Rule 41(a)(2). The Plaintiffs' oral motion was made at the "eleventh-hour" after "a lengthy and stop-and-start pretrial process building up to" the trial in 2023. Recognizing the substantial expense incurred by the defendants in trial preparation in a case that took some eleven years to complete, that included rescheduling the pretrial conference and trial dates on multiple occasions, and indeed, that even took six years after discovery to bring to a head, the district court appropriately "weigh[ed] the relevant equities" under Rule 41(a)(2) in imposing "curative conditions" in the form of rendering judgments against the Plaintiffs. *McCants*, 781 F.2d at 856–57. In fact, the Plaintiffs could have easily dismissed their claims against the seven defendants after discovery closed in 2017, and surely at any point before the trial actually commenced in 2023. A "plaintiff ordinarily will not be permitted to dismiss an action without prejudice under Rule 41(a)(2) after the defendant has been put to considerable expense in preparing for trial, except

on condition that the plaintiff reimburse the defendant for at least a portion of his expenses of litigation." *Id.* at 860.

The Plaintiffs nonetheless argue that they withdrew their Rule 41(a)(2) motion after defense counsel asked the court to impose costs and sanctions as well as entering judgment for the defendants. Before the court entered judgment, Plaintiffs' counsel stated: "I would like to say for the court *if* you're going to make us pay costs . . . I would rather withdraw the motion and just go forward because this is crazy to me."

To be sure, a plaintiff is generally permitted to withdraw a Rule 41 motion for dismissal after it is made. *See, e.g.*, *McGregor v. Bd. of Comm'rs of Palm Beach Cnty.*, 956 F.2d 1017, 1024 (11th Cir. 1992) (Clark, J., concurring in part, and dissenting in part); *Mortg. Guar. Ins. Corp. v. Richard Carlyon Co.*, 904 F.2d 298, 301 (5th Cir. 1990). The problem with the argument, however, is that Plaintiffs' counsel unambiguously moved to dismiss seven of the defendants, claiming that doing so would afford a strategic advantage for his clients against the two remaining defendants, and that doing so would streamline the ease and conduct of the trial itself. In fact, the Plaintiffs unambiguously moved for voluntary dismissal of the seven defendants two times. Only after the defendants raised the issue of claimed prejudice and sought the entry of final judgment, costs, and sanctions did the Plaintiffs respond by saying that *if* the court was going to impose costs, then the Plaintiffs would withdraw their motion.

The Plaintiffs' "withdrawal" language, however, was ambiguous, unclear, and wholly conditional in nature. Plaintiffs' counsel never said that the Plaintiffs were withdrawing their application for voluntary dismissal, not before the district court ruled on the Rule 41(a)(2) motion, or after the court said it would dismiss the seven defendants and render judgment in their favor, or even after the court said it would reserve on the issue of costs or sanctions and decide that matter at a later time. The most that can be said is that, after unambiguously moving for voluntary dismissal twice and explaining their rationale in some detail, the Plaintiffs asked the court to tell them in advance what costs or sanctions, if any, it might impose after it rendered judgment for the defendants. We know of no case or rule (and none has been cited) that would require a district court to decide on costs, or for that matter, sanctions, in advance of ruling on a Plaintiffs' application to voluntarily dismiss a defendant from a case. Under these circumstances, we think the district court acted within its considerable discretion under Rule 41(a)(2) in taking the Plaintiffs at their word, granting their motion to dismiss, rendering judgment, and reserving for a later time whether to impose costs or any other curative consideration.

As for the Plaintiffs' related argument that the district court violated Rule 41(a)(2) and abused its discretion in dismissing only seven of the nine defendants rather than dismissing the entire case, our caselaw has consistently held otherwise. Thus, for example, most recently in *In re Esteva*, 60 F.4th 664 (11th Cir. 2023), we "allow[ed] plaintiffs to voluntarily dismiss less than the entire action so long as they dismiss[ed] a defendant in its entirety (i.e., they

23-12459                    Opinion of the Court                    17

dismiss[ed] all of the claims brought against that defendant).” *Id.* at 677; *see also Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1106 (11th Cir. 2004) (“Put simply, Rule 41 allows a plaintiff to dismiss all of his claims against a particular defendant.”); *Plains Growers, Inc. ex rel. Florists’ Mut. Ins. Co. v. Ickes-Braun Glasshouses, Inc.*, 474 F.2d 250, 255 (5th Cir. 1973) (holding that Rule 41(a)(2) was intended to permit dismissal against some defendants “despite the fact that the case might remain pending against other defendants”).[2] In this case, the district court did just that; it dismissed *all* of the claims pending against seven of the defendants. Again, it did not abuse its broad discretion in applying Rule 41.

## C.

The Plaintiffs also claim that the district court abused its discretion in admitting certain pieces of evidence and testimony: first, allowing defense counsel to impeach Plaintiff Jackson with his serious criminal record; second, that Jackson was a member of a prison gang; third, that marijuana was found in Jackson’s prison cell; fourth, that Jackson took a swipe at Officer Catanzariti before he was subdued and handcuffed; and fifth, that officers were injured in the course of the riot. In the Plaintiffs’ view, these pieces of evidence were not relevant to the claim that Jackson had been struck by the officers after he was handcuffed, subdued, and wholly compliant. Moreover, they say, the admission of these matters unfairly

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. *Id.* at 1209.

prejudiced their case.  The Plaintiffs add that the video evidence offered conclusively establishes that Jackson was struck by Catanzariti and injured only after he was restrained.  *See Charles v. Johnson*, 18 F.4th 686, 692 n.1 (11th Cir. 2021) ("Where video evidence is conclusive, witness testimony cannot be used to introduce a factual dispute." (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007))).  The Plaintiffs ground their argument in Federal Rules of Evidence 401, 402, and 403.  Again, we are unpersuaded.

Rule 401 of the Federal Rules of Evidence explains that evidence is relevant if: (1) it has any tendency to make a fact more or less probable than it would be without the evidence, and (2) the fact is of consequence in determining the action.  Fed. R. Evid. 401. Rule 402 of the Federal Rules of Evidence generally allows the admission of relevant evidence.  Fed. R. Evid. 402.  Rule 403 of the Federal Rules of Evidence, in turn, states that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

Rule 403 is "an extraordinary remedy which should be used sparingly," and a district court's discretion to exclude evidence as unduly prejudicial is "narrowly circumscribed."  *United States v. Cross*, 928 F.2d 1030, 1048 (11th Cir. 1991) (quoting *United States v. Norton*, 867 F.2d 1354, 1361 (11th Cir. 1989)).  The "trial judge is accorded broad discretion in determining whether evidence should be excluded under Rule 403 and we will only reverse when there

has been a clear abuse of discretion." *Borden, Inc. v. Fla. E. Coast Ry. Co.*, 772 F.2d 750, 756 (11th Cir. 1985) (citation omitted); *see also United States v. Costa*, 947 F.2d 919, 924 (11th Cir. 1991). In reviewing a district court's Rule 403 determination, "we look at the evidence in the light most favorable to its admission" by "maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Flanders*, 752 F.3d 1317, 1335 (11th Cir. 2014) (quoting *United States v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002)).

We begin with the district court's ruling allowing the defense to impeach Jackson with the record of his criminal history. Under Federal Rule of Evidence 609, evidence of serious prior convictions, always subject to Rule 403, *must* be admitted for witness impeachment purposes. In pertinent part, Federal Rule of Evidence 609(a)(1)(A) reads this way:

> The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction: for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence: must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant.

Fed. R. Evid. 609(a)(1)(A). "The implicit assumption of Rule 609 is that prior felony convictions have probative value" in assessing a witness's credibility. *United States v. Burston*, 159 F.3d 1328, 1335 (11th Cir. 1998). Because Jackson's convictions for aggravated assault and armed robbery each carried sentences of more than one

year, it is undisputed that Rule 609 would generally allow Jackson's record to be used to impeach him as a party witness at trial.

The heart of the Plaintiffs' argument, however, is that this evidence should have been excluded by the district court under Rule 403's balancing inquiry. The problem with the argument is that the district court acted well within its discretion in determining that this evidence was probative of Jackson's credibility, which was a central issue in the case. This was particularly so because the video evidence was ambiguous. While the admission of the criminal history of a party witness in a civil case may be prejudicial, the essential question under Rule 403 is whether the probative value of this testimony was substantially outweighed by the danger of unfair prejudice. We repeat, Jackson's credibility was essential to his legal claims, there was a square conflict between his testimony and that of the charged officers in the case, and the video evidence was ambiguous and unclear. *See United States v. Pritchard*, 973 F.2d 905, 909 (11th Cir. 1992) (affirming the admission of a witness's criminal record because "the district court correctly saw the credibility of [his] own testimony as vital").

We add that any prejudice in the admission of Jackson's criminal history was minimal because the jury already knew that Jackson was an inmate at Smith State Prison and, therefore, that he had already been convicted of a crime. *See Brown v. Flury*, 848 F.2d 158, 159 (11th Cir. 1988) ("The prejudice and the probative value which the evidence of prior convictions presented were of no importance in this case because the jury was well aware that each

inmate testifying had been convicted of a crime before defense counsel questioned him on his prior convictions."). Moreover, the danger of unfair prejudice was further reduced because this is a civil case. *See Knight ex rel. Kerr v. Miami-Dade County*, 856 F.3d 795, 817 (11th Cir. 2017). In short, the district court did not clearly abuse its discretion in allowing Jackson to be impeached with two prior felony convictions.

The Plaintiffs also argue, again based on Rule 403, that the district court abused its discretion in balancing the probative value against the prejudicial impact of the other pieces of evidence admitted surrounding the riot -- Jackson's gang membership with Stevenson, the finding of marijuana in Jackson's cell, the testimony that he took a swing at Officer Catanzariti, and the evidence surrounding the injuries sustained by other officers. At its core, the argument turns on the claim that the probative value was substantially outweighed by the danger of unfair prejudice because the video evidence unambiguously established that Jackson was beaten after he was handcuffed. Again, we are unpersuaded.

For one thing, the fact that the jury rejected Jackson's excessive force claim against Officer Catanzariti strongly suggests that it did not view the videos as having unambiguously established that Catanzariti used excessive force against Jackson. In fact, a review of the video tapes does not establish with any clarity that Catanzariti struck Jackson when he was handcuffed, or that Jackson was not resisting when Catanzariti purportedly struck him. Nor is it clear and unambiguous from the video evidence that Catanzariti

hit Jackson with a flashlight, as Jackson claimed, and this point was hotly disputed at trial. Catanzariti testified that he was simply "wanding" Jackson to check for contraband.

What's more, this corpus of materials was relevant and material to answering the central question in the case -- whether the correctional officers committed Eighth Amendment constitutional violations against either Plaintiff. The officers' accounts of the events leading up to the riot could not be more relevant. The jury was entitled to hear why Dormitory D-2 was on lockdown that day, how Officer Catanzariti came to find marijuana and contraband cellphones in Jackson's cell, and the critical circumstances surrounding the ensuing riot.

The Eighth Amendment allows a prison guard to apply reasonable force "in a good-faith effort to maintain or restore discipline," so long as the force was not applied "maliciously and sadistically to cause harm." *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). This language was reflected in the verdict form, which asked whether the Plaintiffs proved by a preponderance of the evidence that the officers used force that "was malicious and sadistic for the purpose of causing harm and not applied in a good faith effort to maintain or restore discipline."

Thus, in order to determine whether an officer applied a measure of force in good faith or otherwise maliciously and sadistically, we consider (and the jury plainly was entitled to consider): (1) "the need for the application of force"; (2) "the relationship

23-12459                 Opinion of the Court                  23

between the need and the amount of force that was used"; (3) "the extent of the injury inflicted upon the prisoner"; (4) "the extent of the threat to the safety of staff and inmates"; and (5) "any efforts made to temper the severity of a forceful response." *Id.* (quoting *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (per curiam)).[3] Moreover, we are required to afford "a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." *Id.* (quoting *Cockrell*, 510 F.3d at 1311). In short, the trier of fact was required to balance the measured application of force against the threats posed by the inmates during a prison riot in order to evaluate whether the force that was used was excessive.

The evidence admitted by the district court concerning how the altercation began on December 31, 2010 was relevant to this determination. The discovery of marijuana and cellphones in Jackson's cell and Jackson's attempt to swipe the contraband from Officer Catanzariti's hand offer reasonable explanations for the origin of the fight between Catanzariti and Jackson and how and why Jackson came to be handcuffed in the first place.

Moreover, the testimony of inmate George Anderson that Jackson and Stevenson were ranking members in a prison gang,

---

[3] In fact, the trial court's instructions to the jury on excessive force included the following: "In making that decision [whether the force used was excessive] you should consider the amount of force used in relationship to the need presented; the motive of the officer; the extent of the injury inflicted; and any effort made to temper the severity of the force used."

Gangster Disciples, established the relationship between the Plaintiffs, offered an explanation for why Jackson may have wanted to keep the officers from securing the contraband, and further illuminated the serious dangers posed to the correctional officers in Dormitory D-2. Again, the evidence was relevant to the correctional officers' use of force that day. Similarly, the nature and extent of the injuries sustained by the officers (just like the extent of the injuries sustained by the Plaintiffs) bear directly on the amount of force the officers used in the course of subduing the riot. *See Hudson*, 503 U.S. at 7 (noting that "the need for application of force, the relationship between that need and the amount of force used, [and] the threat 'reasonably perceived by the responsible officials'" are considerations in evaluating an excessive force claim (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986))).

Finally, even if we were to credit the Plaintiffs' argument that the video evidence was unambiguous and that Jackson had been struck after he was restrained -- and this is hotly disputed, the video recordings are anything but clear on the point, and the jury obviously rejected it -- the other evidence would still have been relevant to any fair examination of Stevenson's excessive force claim, who was after all also being tried at the same time before the same jury. The trier of fact was entitled to examine the totality of the circumstances in evaluating this excessive force case.

In short, any review of this body of evidence, taken on appeal "in the light most favorable to its admission," yields the conclusion that the district court did not abuse its considerable

23-12459                Opinion of the Court                25

discretion, and accordingly, we affirm the district court's final judgments.  *Borden*, 772 F.2d at 756; *Flanders*, 752 F.3d at 1335.


**AFFIRMED.**